# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### Case No. 2:13-cv-01324-JAD

---

MONTANA DEPARTMENT OF REVENUE,
    Appellant,

    v.

TIMOTHY L. BLIXSETH,
    Appellee,

Appeal from the Bankruptcy Court for
the District of Nevada

Bankr. No. 11-15010-BAM;
*In re Timothy L. Blixseth*;
Involuntary Chapter 7

---

## <u>APPELLANT'S OPENING BRIEF</u>

---

Rodney M. Jean
NV Bar # 1395
rjean@lionelsawyer.com
Lionel Sawyer & Collins
300 S. 4th St., Suite #1700
Las Vegas, NV 89101
(702) 383-8830
(702) 383-8845 (fax)

Lynn Hamilton Butler
TX Bar #03527350
lynn.butler@huschblackwell.com
Husch Blackwell LLP
111 Congress Avenue, Suite #1400
Austin, TX 78701
(512) 472-5456
(512) 226-7318 (fax)
Admitted *Pro Hac Vice*

Keith A. Jones
MT Bar #6518
kjones@mt.gov
Special Assistant Attorney General
Montana Dept. of Revenue, Legal Services Office
125 North Roberts Street / P.O. Box 7701
Helena, MT  59604-7701
(406) 444-5884
(406) 444-3696 (fax)
Admitted *Pro Hac Vice*

*Attorneys for Appellant Montana Department of Revenue*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ............................... 1

II.   STATEMENT OF ISSUES PRESENTED AND STANDARD OF APPELLATE
      REVIEW ......................................................................................................................... 1

      A.    Issues Presented ................................................................................................... 1

      B.    Standard of Appellate Review ............................................................................. 3

            1.    Questions of Law; Questions of Fact ........................................................ 3

            2.    De Novo Review of the "Bona Fide Dispute" Determinations in
                  this Case .................................................................................................... 3

III.  STATEMENT OF THE CASE ......................................................................................... 5

      A.    Introduction .......................................................................................................... 5

      B.    Procedural History ............................................................................................... 8

            1.    Bankruptcy Petition ................................................................................. 8

            2.    Creditor Eligibility .................................................................................. 8

      C.    Statement of Facts ............................................................................................... 9

            1.    The California Claim ................................................................................ 9

                  (a)    Mr. Blixseth's Sworn Tax Returns ................................................. 9

                  (b)    Lack of Evidence of a Dispute ...................................................... 10

            2.    The Idaho Claim ..................................................................................... 11

                  (a)    Idaho's Final Judgment; Mr. Blixseth's Sworn Tax Returns ....... 11

                  (b)    Lack of Evidence of a Dispute .................................................... 12

                  (c)    Idaho's Collections-Motivated Settlement Discount ................... 13

            3.    The Montana Claim ................................................................................ 14

            4.    Requisite Number of Creditors for an Involuntary Filing ....................... 20

IV.   ARGUMENT ................................................................................................... 23

    A.    There Was No Bona Fide Dispute as to the California Claim ............................ 23

    B.    There Was No Bona Fide Dispute as to the Idaho Claim .................................... 25

    C.    There Was No Bona Fide Dispute as to the Montana Claim ............................... 26

        1.    MDOR followed its own procedures to notify Mr. Blixseth of his undisputed tax liability and to demand payment ...................................... 26

        2.    Mr. Blixseth's failure to appeal MDOR's Audit Issue #4 determination and assessment of tax liability rendered that determination and assessment indisputable and immediately collectable ................................................................................................... 28

        3.    Mr. Blixseth's appeal to the State Tax Appeals Board did not resurrect a possible dispute after Mr. Blixseth's previous concessions and failure to appeal Audit Issue #4 .................................... 30

        4.    The Bankruptcy Court Misapplied Montana Tax Law to Reach an Erroneous Legal Conclusion .................................................................... 31

    D.    The Bankruptcy Court Failed to Properly Apply the Shifting Burden of Proof Required by C&C Jewelry ......................................................................... 33

    E.    The Bankruptcy Court Ignored Controlling Ninth Circuit Precedent on the Eligibility of Undisputed Claims ....................................................................... 36

    F.    The Bankruptcy Court Erred In Concluding As A Matter Of Law That Mr. Blixseth Had Met His Burden of Showing He Had 12 or More Creditors as of the Petition Date ............................................................................................. 41

        1.    Mr. Blixseth Bore the Initial Burden of Showing He Had 12 or More Eligible Creditors as of the Petition Date ........................................ 41

        2.    The Bankruptcy Court Erred In Concluding That Mr. Blixseth Met His Burden To Show He Had 12 or More Eligible Creditors as of the Petition Date ................................................................................. 44

            A.    Creditors With No Claims As of the Petition Date ....................... 45

            B.    Creditors Receiving Disqualifying Avoidable Transfers .............. 46

V.    CONCLUSION ................................................................................................. 50

# TABLE OF AUTHORITIES

## FEDERAL COURT CASES

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
   660 F.3d 384 (9th Cir. 2011) ................................................................. 3

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505 (1988) ...................................................... 42

*Bartmann v. Maverick Tube Corp.*,
   853 F.2d 1540 (10th Cir. 1988) ............................................................. 3

*C&C Jewelry*,
   2001 WL 36340326 ................................................................... passim

*Chicago Title Ins. Co. v. Seko Invs., Inc.*,
   156 F.3d 1005 (9th Cir. 1998) .................................................. 36, 38, 41

*Faberge Restaurant*,
   222 B.R. at 388 .............................................................................. 24

*Focus Media, Inc. v. Nat'l Broad. Co. Inc.*,
   378 F.3d 916 (9th Cir. 2004) .............................................. 36, 37, 38, 41

*Greyhound Computer Corp., Inc. v. Int'l Business Machines Corp.*,
   559 F.2d 488 (9th Cir. 1977) ............................................................... 34

Grimmett v. Brown,
   75 F.3d 506 (9th Cir. 1996) ................................................................. 46

*In re A & J Quality Diamonds, Inc.*,
   377 B.R. 460 (Bankr. S.D.N.Y. 2007) ..................................................... 34

*In re BDC 56 LLC*,
   330 F.3d 111 (2nd Cir. 2003) ............................................................... 34

*In re Blue Coal Corp.*,
   166 B.R. 816 (Bankr. M.D. Pa. 1993) ..................................................... 31

*In re Braten*,
   99 B.R. 579 (Bankr. S.D.N.Y. 1989) ....................................................... 24

*In re Byrd*,
   357 F.3d 433 (4th Cir. 2004) ............................................................... 34

*In re C&C Jewelry Mfg., Inc.*,
   2001 WL 36340326 (9th Cir. BAP 2009) .................................................. 4

*In re Carvalho Industries, Inc.*,
   68 B.R. 254 (Bankr. D.Ore. 1986) ......................................................... 24

*In re Claxton*,
   21 B.R. 905 (Bankr. E.D.Va. 1982) ........................................................ 24

*In re Colon*,
474 B.R. 330 at 387 ........................................................................ 33, 34, 43

*In re Coppertone Communications, Inc.*,
96 B.R. 233 (Bankr. W.D.Mo. 1989) .................................................... 43

*In re DemirCo Holdings, Inc.*,
2006 Bankr. LEXIS 1131, 2006 WL 1663237 (Bankr. C.D. Ill. 2006)................. 37, 38, 39, 40

*In re Dilley*,
339 B.R. 1 (1st Cir. BAP 2006).......................................................... 4, 34

*In re Elverson*,
2013 WL 2138875 (Bankr. E.D. Pa. 2013) ............................................ 38

*In re EM Equipment, LLC*,
__B.R. __, 2013 WL 6859336 (Bankr. D. Conn. 2013)........................... 38

*In re Faberge Restaurant of Florida, Inc.*,
222 B.R. 385 (Bankr. S.D. Fla. 1997) ................................................. 24

*In re Francis*,
505 B.R. 914 (9th Cir BAP 2014) ....................................................... 3

*In re Fustolo*,
__ B.R. __, 2013 WL 6577295 (Bankr. D. Mass. 2013) ......................... 38

*In re Global Waste*,
207 B.R. 542 (Bankr. N.D.Oh. 1997) ............................................. 42, 43

*In re Green*,
2007 WL 1093791 (Bankr. W.D.Tx. 2007) (unpublished) ..................... 43

*In re Hentges*,
350 B.R. 586 (Bankr. N.D. Okl. 2006) ................................................ 23

*In re Hicks*,
2011 WL 6000861 (E.D. Tn. 2011)..................................................... 35

*In re Int'l Teldata Corp.*,
12 B.R. 879 (Bankr. D. Nev. 1981) .................................................... 47

*In re Marciano*,
459 B.R. 27 (9th Cir. BAP 2011) ................................................. 3, 4, 25, 35

*In re McGinnis*,
296 F.3d 730 (8th Cir. 2002) ............................................................ 34

*In re McIsaac*,
19 B.R. 391 (Bankr. D.Mass. 1982) .................................................. 43

*In re Mele*,
501 B.R. 357 (9th Cir. BAP 2013) ...................................................... 3

*In re Miller*,
489 B.R. 74 (Bankr. E.D. Tenn. 2013) .......................................... 38, 39, 40

*In re Moss*,
  249 B.R. 411 (Bankr. N.D.Tx. 2000) ........................................................... 43

*In re Mountain Country Partners, LLC*,
  2012 WL 2394714 (Bankr. S.D. W.V. 2012) ................................................ 38

*In re Narragansett Clothing Co.*,
  143 B.R. 582 (Bankr. D.R.I. 1992) ............................................................... 35

*In re Rimell*,
  946 F.2d 1363 (8th Cir. 1991) ........................................................................ 3

*In re Roselli*,
  2013 WL 828304 (Bankr. W.D. N.C. 2013) ................................................. 38

*In re Rothery*,
  143 F.3d 546 (9th Cir. 1998) ........................................................... 42, 43, 45

*In re Seventh Ave. Properties*,
  2013 WL 655871 (M.D. Tn. 2013) ........................................................ 34, 35

*In re Sjostedt*,
  57 B.R. 117 (Bankr. M.D.Fla. 1986) ............................................................ 24

*In re Smith*,
  415 B.R. 222 (Bankr. N.D.Tx. 2009) ........................................................... 43

*In re Taub*,
  439 B.R. 261 (Bankr. E.D. N.Y. 2010) ........................................................ 34

*In re Tucker*,
  2010 WL 4823917, 2010 Bankr. LEXIS 3971 (Bankr. N.D. W.Va. Nov. 22, 2010) ............... 40

*In re Vortex Fishing Systems, Inc.*,
  277 F.3d 1057 (9th Cir. 2001) .......................................................... 3, 23, 24, 33

*In re Wishgard*,
  __ B.R. __, 2013 WL 1774707 (Bankr. W.D. Pa. 2013) ............................. 34

*Matter of Busick*,
  831 F.2d 745 (7th Cir. 1987) ....................................................................... 40

*Reed v. Thornton*,
  43 F.2d 813 (9th Cir. 1930) .......................................................................... 24

*U.S. v. McConney*,
  728 F.2d 1195 (9th Cir. 1984) ........................................................................ 3

*White v. Abrams*,
  495 F.2d 724 (9th Cir. 1974) ........................................................................ 34

## STATE COURT CASES

*Executone of Memphis, Inc. v. Garner*,
  650 S.W.2d 734 (Tenn. 1983) ......................................................................... 4

# FEDERAL STATUTORY AUTHORITIES

11 U.S.C. §101(10) .................................................................................................... 45

11 U.S.C. §101(12) .................................................................................................... 45

11 U.S.C. §101(5) ...................................................................................................... 45

11 U.S.C. §303 ............................................................................................................. 7

11 U.S.C. §303(b) ................................................................................................. passim

11 U.S.C. §303(b)(1) ............................................................................................ passim

11 U.S.C. §303(b)(2) ................................................................................................... 5

11 U.S.C. §544 .......................................................................................................... 46

11 U.S.C. §545 .......................................................................................................... 46

11 U.S.C. §547 ..................................................................................................... 46, 49

11 U.S.C. §547(b) ..................................................................................................... 46

11 U.S.C. §548 .......................................................................................................... 46

11 U.S.C. §549 ................................................................................................ 46, 47, 49

11 U.S.C. §549(b) ..................................................................................................... 47

11 U.S.C. §724(a) ..................................................................................................... 46

26 C.F.R. §1.162-21 .................................................................................................. 15

26 U.S.C. §162(f) ................................................................................................. 15, 16

28 U.S.C. §1334(a) ..................................................................................................... 1

28 U.S.C. §157(b)(1) .................................................................................................. 1

28 U.S.C. §158(1)(1) .................................................................................................. 1

28 U.S.C. §158(a)(1) .................................................................................................. 1

28 U.S.C. §158(c)(1)(B) ............................................................................................ 1

# STATUTORY AUTHORITIES

Idaho Code §63-3048(b)(3) ....................................................................................... 13

# FEDERAL RULES AND REGULATIONS

Fed. R. Bankr. P 1003(b) .......................................................................................... 42

FED. R. BANKR. P. 8001 ............................................................................................... 1

Fed. R. Bankr. P. 8002 ............................................................................................... 1

FED. R. BANKR. P. 8013 ............................................................................................... 3

FED. R. CIV. P. 12 ..................................................................................................... 42

Fed. R. Civ. P. 12(d) ........................................................................................ 5

Fed. R. Civ. P. 56(c) ..................................................................................... 4, 5

## TREATISES

2 Bankr. Service L. Ed. § 13:176 (2013) ........................................................ 34

2 Bankr. Service L. Ed. §13:212 (Jan. 2013) .................................................. 23

2 Collier on Bankruptcy ¶ 303.11[3] (16th ed. 2011) ................................. 33, 34

2 Collier on Bankruptcy ¶ 303.14[10] (16th ed. 2011) ................................... 24

2 Collier on Bankruptcy ¶303.11[2] (16th ed. 2013) ........................................ 38

## LEGISLATIVE MATERIALS

H.R. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 149 (2005)..................................................... 40

## ADDITIONAL AUTHORITIES

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
    Pub.L.No. 109-8,119 Stat. 23 ........................................................... 37

**I.**
**STATEMENT OF THE BASIS OF APPELLATE JURISDICTION**

The Bankruptcy Court had jurisdiction over the involuntary bankruptcy petition (the "Petition") filed by the petitioning creditors[1] against Timothy L. Blixseth ("Mr. Blixseth") pursuant to 28 U.S.C. §157(b)(1) and §1334(a).  On July 10, 2013, the Bankruptcy Court issued an Order Granting Motion to Dismiss Involuntary Case (the "Order").  (MER 1:1:00001.)[2]  That Order was a final order.  On July 22, 2013, pursuant to 28 U.S.C. §158(a)(1) and FED. R. BANKR. P. 8001 and 8002, petitioning creditor Montana Department of Revenue ("MDOR") timely appealed that Order to the United States Bankruptcy Appellate Panel of the Ninth Circuit.  (MER 4:19:00686).  On July 23, 2013, pursuant to 28 U.S.C. §158(c)(1)(B) and FED. R. BANKR. P. 8001, Mr. Blixseth declined to have that appeal heard by the BAP.  This Court has appellate jurisdiction pursuant to 28 U.S.C. §158(1)(1).

**II.**
**STATEMENT OF ISSUES PRESENTED AND STANDARD OF APPELLATE REVIEW**

**A.    Issues Presented.**

1.    For the purpose of determining whether the Petitioning Creditors were qualified petitioning creditors under 11 U.S.C. §303(b)(1), did the Bankruptcy Court err in concluding:

(a)    That California Franchise Tax Board's ("California") tax claim was subject to a *bona fide* dispute, when (i) the claim arose out of the debtor's own sworn tax returns, (ii) the debtor provided no evidence he contested the claim pre-petition, and (iii) post-petition, the debtor paid California 100% of the liability owed?

---

[1] The three original petitioning creditors were the Montana Department of Revenue, the Idaho State Tax Commission, and the California Franchise Tax Board, and they were eventually joined by the Yellowstone Club Liquidating Trust (collectively, the "Petitioning Creditors").

[2] Citations to MDOR's Excerpts of Record are formatted as "MER [volume]:[tab]:[page number]."  For example, the first cite above is to volume 1, tab 1, page 00001.

(b)     That Idaho State Tax Commission's ("Idaho") tax claim was subject to a *bona fide* dispute, when (i) the claim arose out of the debtor's own sworn tax returns and was reduced to a final, non-appealable judgment, (ii) the debtor provided no evidence he contested the claim pre-petition, (iii) post-petition, the debtor paid 82% of the liability owed in settlement of the claim and the debt was otherwise uncollectible?

(c)     That MDOR's tax claim was subject to a *bona fide* dispute, when (i) the tax liability was based upon an admitted, unlawful federal tax deduction; (ii) in state tax proceedings, the debtor repeatedly conceded it was due and waived his right to appeal that issue; and (iii) the debtor failed to respond in any way to MDOR's demand for payment?

2.      Did the Bankruptcy Court err by ignoring controlling case law in concluding that the debtor could obtain dismissal of an involuntary bankruptcy case by entering into post-petition settlements with two of the three original Petitioning Creditors?

3.      Did the Bankruptcy Court err by failing to apply the correct burden of proof to the debtor's presentation of evidence of a *bona fide* dispute as to each claim, which under controlling law requires more than a cursory denial of liability and generalized allegations?

4.      Did the Bankruptcy Court err in concluding that the 2005 BAPCPA amendment to 11 U.S.C. §303(b)(1) overturned controlling Ninth Circuit authority, when virtually all recent cases have held otherwise, concluding that petitioning creditors' claims are legitimate if their undisputed portions collectively exceed §303(b)'s $15,325 threshold?

5.      Having held that the Yellowstone Club Liquidating Trustee was a qualifying creditor for purposes of 11 U.S.C. §303(b)(1),  did the Bankruptcy Court err in dismissing this case when the debtor did not meet his burden of proving he had more than 11 creditors as of the petition date?

B. **Standard of Appellate Review.**

1. **Questions of Law; Questions of Fact.**

This Court reviews *de novo* questions of law, including issues of statutory construction involving the Bankruptcy Code. *In re Marciano*, 459 B.R. 27, 35 (9th Cir. BAP 2011) ("*Marciano*"); *In re Francis*, 505 B.R. 914, 917 (9th Cir BAP 2014); *U.S. v. McConney*, 728 F.2d 1195, 1200-01 (9th Cir. 1984). Under *de novo* review, this Court's analysis "is independent, with no deference given to the trial court's conclusion." *Marciano I*, 459 B.R. at 34. This Court must "consider [the] matter anew, as if no decision had been made previously." *Francis*, 505 B.R. at 917; *In re Mele*, 501 B.R. 357, 362 (9th Cir. BAP 2013).

Conversely, the Court must set aside findings of fact when they are clearly erroneous. Fed. R. Bankr. P. 8013; *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 395 (9th Cir. 2011). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543 (10th Cir. 1988).

2. *De Novo* **Review of the "*Bona Fide* Dispute" Determinations in this Case.**

Here, the question presented as to the original Petitioning Creditors is whether California, Idaho, and MDOR's claims were subject to a *bona fide* dispute for the purposes of 11 U.S.C. §303(b). Under Ninth Circuit BAP authority, that question is subject to *de novo* review.

Whether a *bona fide* dispute exists is usually a factual inquiry, and thus would typically fall under a clearly erroneous standard. *In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057, 1064 (9th Cir. 2001); *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir. 1991). However, the standard shifts to *de novo* review when one of two circumstances applies—and here, both apply.

First, this Court must conduct a *de novo* review if the facts below were "undisputed," meaning the sole question was whether those facts established a *bona fide* dispute for §303(b) purposes. *In re Dilley*, 339 B.R. 1, 5 (1st Cir. BAP 2006); *Executone of Memphis, Inc. v. Garner*, 650 S.W.2d 734, 736 (Tenn. 1983). In the case at bar, as explained below, (i) the material facts regarding all three Petitioning Creditors were essentially undisputed, and (ii) on such facts, Mr. Blixseth did not meet his burden of establishing any *bona fide* disputes.

Second (and independently), this Court must conduct a *de novo* review if the lower court's *bona fide* dispute determination was "made in the context of a summary judgment analysis." *Marciano I*, 459 B.R. at 35-36; *In re C&C Jewelry Mfg., Inc.*, 2001 WL 36340326 at *4-5 (9th Cir. BAP 2009) (unpublished). As the Ninth Circuit BAP explained:

> Findings of fact made in summary judgment proceedings are not entitled to the 'clearly erroneous' standard of review because the trial court has not weighed the evidence in the conventional sense. Rather, the reviewing court must stand in the same position as the court below and apply the standards set forth in Civil Rule 56(c). Thus, we review *de novo* a bankruptcy court's decision to grant summary judgment. Accordingly, when the determination that there is no *bona fide* dispute for purposes of §303 is made in the context of a summary judgment analysis, our review is *de novo* rather than applying a clearly erroneous standard. In the context of determining whether there is a *bona fide* dispute for purposes of §303, "[a] bankruptcy court is not asked to evaluate the potential outcome of a dispute, but merely to determine whether there are facts that give rise to a legitimate disagreement over whether money is owed, or, in certain cases, how much.

*Marciano I*, 459 B.R. 27, 35-36 (internal quotations and citations omitted); *see also C&C Jewelry*, 2001 WL 36340326 at *4-5 (applying de novo review to a §303 summary judgment determination); *Dilley*, 339 B.R. at 5 (same).

Here, the lower court applied a summary judgment analysis. Judge Markell stated that because the parties conducted discovery and presented evidence at a two-day hearing, Mr. Blixseth's motion to dismiss was converted "into a partial summary judgment motion" and the

Court applied "Civil Rule 56's standard."  (MER 1:1:00004 (lines 3-12).)  To prevail, Mr. Blixseth had to show "there was no genuine dispute as to any material fact and he is entitled to judgment as a matter of law."  *Id.* (emphasis added).  Accordingly, this Court must review *de novo* the Bankruptcy Court's determinations as to whether California, Idaho, and MDOR's claims were subject to *bona fide* disputes.

### III.
### STATEMENT OF THE CASE

**A.**    <u>**Introduction.**</u>

Under 11 U.S.C §303(b)(1), three petitioning creditors may commence an involuntary bankruptcy case if they hold claims against a person which aggregate to more than $15,325[3] and are "not…the subject of a *bona fide* dispute as to liability or amount" on the petition date.   If there are fewer than 12 such creditors, a single creditor may file the petition.   11 U.S.C. §303(b)(2).

As noted above, the Bankruptcy Court converted this into a summary judgment matter under FED. R. CIV. P. 12(d), stating there are no genuine disputes as to any material facts.  The main issues on appeal, pursuant to 11 U.S.C. §303(b), are (1) whether the original Petitioning Creditors held undisputed claims under controlling Ninth Circuit law, and (2) whether Mr. Blixseth proved he had twelve or more creditors, such that at least three petitioning creditors were required to file the petition, or less than twelve, in which case one would do.

Here, on April 5, 2011 (the "Petition Date"), the three Petitioning Creditors—California, Idaho, and MDOR—filed the Petition against Timothy Blixseth. (MER 1:3:00039).  The Petition was subsequently joined by the Yellowstone Club Liquidating Trustee (the "YCLT") prior to hearing.  (MER 1:6:00049.)  Mr. Blixseth contested the Petition by filing a motion to dismiss in

---

[3] The threshold was $14,425 when this case was filed in 2011.

which he alleged that the Petitioning Creditors did not hold undisputed claims.  At the hearing on the motion, the Petitioning Creditors had to make a *prima facie* case as to why their claims were not subject to a *bona fide* dispute as to liability or amount.  Idaho's claim is based on a non-appealable, final state court judgment and Mr. Blixseth's own sworn tax returns.  California's claim is likewise based on Mr. Blixseth's sworn tax returns.  MDOR's claim is based on Mr. Blixseth's sworn admissions as to tax audit liability.  The YCLT's claim is based on an unstayed final judgment.  Undisputed evidence established these claims.  In sum, the Petitioning Creditors also met their burden of proving up *per se* qualifying claims both under controlling Ninth Circuit law and under the correct majority interpretation of Bankruptcy Code §303(b)(1)'s phrase "subject of a bona fide dispute as to liability or amount."

That *prima facie* case then shifted the burden to Mr. Blixseth to establish, with credible evidence, the existence of an objective *bona fide* dispute as to each Petitioning Creditors' claims as of the Petition Date.  Mr. Blixseth failed to submit anything more than vague allegations and boilerplate settlement language adopted to obtain a dismissal.  Under controlling Ninth Circuit law, all four Petitioning Creditors, and not just one (i.e., the YCLT), should have been deemed to hold liquidated claims not subject to a *bona fide* dispute as of the Petition Date.

Separately, the Bankruptcy Code mandates that three qualified petitioning creditors must participate in the involuntary petition if and only if the involuntary debtor has twelve or more creditors.  To require that three creditors participate in the petition, Mr. Blixseth had to show he had the requisite twelve or more creditors under Bankruptcy Code §303(b)(2).  If Mr. Blixseth had 11 or fewer qualifying creditors, only one qualifying petitioning creditor would be required to have filed the Petition.

As to Mr. Blixseth's burden of proof, he alleged the potential existence of 18 qualifying creditors under §303(b)(2).  Of those 18, a significant majority failed to qualify as creditors for §303 purposes, in that (i) their claims were either paid prior to the Petition Date or (ii) they were recipients of avoidable transfers under Chapter 5 of the Bankruptcy Code.  Both circumstances disqualify such creditors from counting toward the required 12 creditors.  The unrefuted evidence showed that Mr. Blixseth had fewer than the 12 creditors necessary to avoid a one-creditor filing.  Consequently, only one qualified petitioning creditor out of the four that participated was necessary to defeat Mr. Blixseth's motion to dismiss.  Here, the Bankruptcy Court found that YCLT was an eligible creditor.

The Bankruptcy Court erred in its conclusions on a number of points.  If, in its *de novo* review, this Court concludes that any two of the original Petitioning Creditors (i.e., Idaho, California, or MDOR) held eligible, undisputed claims, the Court should reverse and remand for further proceedings.  Alternatively, since the Bankruptcy Court held that the YCLT held an eligible claim, if this Court concludes that Mr. Blixseth failed to meet his burden of proving up the existence of 12 or more eligible creditors, the Court should reverse and remand for further proceedings.  MDOR respectfully requests this Court reverse the Bankruptcy Court's Order, render a judgment denying Mr. Blixseth's motion to dismiss, and remand the case for further proceedings.

B.    **Procedural History.**[4]

1.    **Bankruptcy Petition.**

On April 5, 2011, the tax revenue departments of three States filed the involuntary Petition against Mr. Blixseth.  (MER 1:3:00039)  The three original Petitioning Creditors were California, owed $986,957.95 for tax year 2007; Idaho, owed $1,117,914.00 for tax years 2005, 2007, and 2008; and MDOR, owed $219,258.00 for tax year 2004.  (*Id.*)  Two weeks later, Mr. Blixseth settled his debts with California and Idaho for payments of 100% and 82% of the amounts owed, respectively, prompting those two States to withdraw from the Petition.  (MER 1:4:00043; 1:5:00045)

2.    **Creditor Eligibility.**

In 2013,[5] Mr. Blixseth filed an Amended Motion to Dismiss the Involuntary Case, alleging that none of the original Petitioning Creditors were eligible under 11 U.S.C. §303(b) because their claims were subject to *bona fide* disputes on the Petition Date.  (MER 1:7:00059.) MDOR filed an opposition (MER 1:8:00080; 1:9:00117) and Mr. Blixseth filed a reply (MER

---

[4] This case arises out of a Montana bankruptcy which has led to numerous other lawsuits (and related appeals, recusal proceedings, and sanctions proceedings) to which Mr. Blixseth is a party.  *See, e.g.,* appeals pending before the 9th Circuit, including, Case Nos. 13-35113, 13-35122, 13-35190, 13-35245, 13-35246, 14-35159, 14-35160, 14-35363, 14-35395, 14-35438, 14-56182, and 14-56184; appeals and matters pending in federal district courts, including Case Nos. 1:2010-cv-12182 (Mass.), 1:2012-cv-00393 (Colo.), 2:2012-cv-01503 (W.D. Wash.), 2:2013-cv-00068 (Mont.), 2:2013-cv-01434 (Nev.), 2:2013-cv-01737 (Nev.), 2:2014-cv-00045 (Mont.); and matters pending in bankruptcy courts, including Case Nos. 2:08-bk-61570 (Mont.), 2:09-bk-60061 (Mont.), 2:09-bk-60452 (Mont.), 2:09-bk-61893 (Mont.), 2:09-ap-00014 (Mont.), 2:09-ap-00018 (Mont.), 2:09-ap-00064 (Mont.), 2:09-ap-00015 (Mont.), 2:10-ap-00088 (Mont.), and 2:14-bk-13594 (W.D. Wash.).

[5] On April 8, 2011, the Bankruptcy Court *sua sponte* issued an Order to Show Cause why venue was proper in the District of Nevada.  On May 27, 2011, the Bankruptcy Court held that venue in Nevada was improper and ordered the case dismissed.  MDOR appealed that dismissal to the United States Bankruptcy Appellate Panel of the Ninth Circuit.  On December 17, 2012, the BAP reversed the Bankruptcy Court's decision.  Mr. Blixseth filed a notice of appeal to the Unites States Ninth Circuit Court of Appeals.  However, he later moved to voluntarily dismiss that appeal and return the case to the Bankruptcy Court.

1:10:00125).  On May 8, 2013, the YCLT filed a joinder in the petition.  (MER 1:6:00059.)  On June 13 and 14, 2013, the Bankruptcy Court held an evidentiary hearing regarding §303(b) eligibility issues, and followed that with an order ruling on the parties' evidentiary objections. (MER 1:2:00018.)  Mr. Blixseth, MDOR, and the YCLT then submitted closing argument briefs. (MER 3:15:00534 through MER 4:17:00627.)

On July 10, 2013, the Bankruptcy Court issued an Order Granting Mr. Blixseth's Motion to Dismiss Involuntary Case (the "Order").  (MER 1:1:00001-00017.)  In the Order, the Bankruptcy Court held California, Idaho, and MDOR were not eligible petitioning creditors under §303(b), because their claims were subject to *bona fide* disputes on the Petition Date.  (*Id.*) The Bankruptcy Court held that YCLT was eligible, but, because the Court found that there were over 12 total creditors on the Petition Date, the Court dismissed the Petition for having an insufficient number of petitioning creditors.  (*Id.*)  MDOR timely appealed.

**C.**     **Statement of Facts.**

       **1.**     **The California Claim.**

           **(a)**     **Mr. Blixseth's Sworn Tax Returns.**

Mr. Blixseth filed a 2007 California state tax return on October 15, 2008, in which he, under penalty of perjury, self-reported his liability as $690,127.  (MER 4:20:00708.)  Mr. Blixseth admitted that he never paid that tax liability prior to the Petition Date.  (MER 2:13:00298 (at lines 1-5); 00303 (at 18-19).)  Mr. Blixseth never amended his 2007 return. (MER 2:13:00296 (at 25)-00297 (at 7); 00304 (at 18-19).  Over the years, California mailed numerous notices and demand letters to Mr. Blixseth regarding this liability.[6]  Mr. Blixseth failed to respond to any of those notices.

---

       [6] *See*, MER 4:23:00785-00786; MER 4:23:00787-00788; MER 4:23:00789-00790 and

After the Petition was filed in this case, Mr. Blixseth entered into a settlement agreement by which he paid $992,300.99, the entire amount claimed by California, including the original tax liability and every dollar claimed in penalties and interest.  (MER 4:24:00821.)  California then withdrew its participation in the Involuntary Case.  The Bankruptcy Court nonetheless held the California claim was subject to a *bona fide* dispute as of the Petition Date.

### (b)      Lack of Evidence of a Dispute.

Mr. Blixseth admitted that, in the face of California's many notices, liens, and garnishment attempts, he never submitted any written response disputing California's claim. (MER 2:13:00299 (at 18-20); 00300 (at 8-10); 00304 (at 11).)  He claimed his agents telephoned California (MER 2:13:00297 (at 2-4); 00301 (at 12-15); 00304 (at 11-14)), but Mr. Blixseth provided no evidence of such conversations—just generalized, inadmissible hearsay—and neither Mr. Blixseth nor his attorney Mr. Flynn could identify the date, time, or substance of even a single call.

To be clear, though the Code and Ninth Circuit law required Mr. Blixseth to provide evidence of a *bona fide* dispute (as discussed in Section IV(D) below), he failed to define any specific, particularized objection regarding his California return.   Though approximately a million dollars was at issue, Mr. Blixseth sent nothing in writing to California disputing even a single line item in the return.  Before the Bankruptcy Court, Mr. Blixseth and Mr. Flynn (his attorney) merely spoke in vague generalities about the return as a whole.  (MER 2:13:00295 (at 18)-00296 (at 11) (referring simply to the "numbers" in the return generally).)  Neither testified as to any item—*i.e.,* a specific income entry, a particular deduction, or a number in a schedule— that was purportedly incorrect.  Mr. Blixseth chose not to call as a witness the accountant who

---

00794-00797;  MER  4:23:00807-00808  and  00818-00819;  MER  4:23:00791-00793, 00798-00803, and 00809-00817; and MER 4:23:00806.

prepared Mr. Blixseth's California return (Mack, Roberts, and Co., LLC) (MER 4:20:00709), or anyone who allegedly had conversations with California.

The only evidence cited by the Bankruptcy Court in finding Mr. Blixseth had a *bona fide* dispute with his own tax return was Recital B of the California settlement agreement, executed two weeks after the Petition was filed.  (MER 1:1:00014 (at 16-25).)  That recital reads in full:

> FTB [California's tax agency] contends that, as of April 18, 2011, Blixseth owes FTB $992,300.99 related to the 2007 tax year and that the current per diem amount on this obligation is $108.75. Blixseth disputes this amount contending that he is owed a substantial refund from FTB, which he is prepared to litigate in the appropriate forum. Blixseth also contends that he has other claims against FTB.

(MER 4:24:00821.)  In documents subpoenaed from California, the correspondence between Mr. Blixseth's attorney and California regarding that boilerplate settlement language does not reveal any *bona fide* dispute, only an effort to get the California Board to say that its withdrawal was *nunc pro tunc* in an attempt to set up Mr. Blixseth's *bona fide* dispute argument.   (MER 4:22:00778-00783.)

## 2.    The Idaho Claim.

### (a)    Idaho's Final Judgment; Mr. Blixseth's Sworn Tax Returns.

MDOR's *prima facie* case for Idaho's Petition claim was based on that State's final, non-appealed judgment, which in turn was based on Mr. Blixseth's own sworn tax returns.

Mr. Blixseth filed 2005, 2007, and 2008 Idaho state tax returns in which he self-reported his liability at $144,199, $659,373, and $108,665, respectively.  (MER 5:25:00825-5:27:00979.) Mr. Blixseth admitted that at no time prior to the Petition Date did he pay the resulting $912,237 liability, but for five monthly $10,000 installments made on his 2007 obligation.[7]   Mr. Blixseth

---

[7] (MER 2:13:00313 (at 8)-00314 (at 13).)   Those payments were based on the full liability due, not any agreement between Mr. Blixseth and Idaho.  (*Id*.)

never amended those sworn returns nor requested a refund.  (MER 2:13:00332 (at 6-12).)  Idaho

mailed at least 16 notices and demands to Mr. Blixseth regarding this liability.[8]

Furthermore, Idaho filed a state court complaint against Mr. Blixseth as to his 2007 and

2008 returns,[9] for which Mr. Blixseth admitted receiving service. (MER 2:13:00325 (at 20)-

00326 (at 15); MER 5:44:01022.)  Mr. Blixseth voluntarily chose not to respond to the complaint

(MER 2:13:00326 (at 18-19), and the Idaho court issued a default judgment against Mr. Blixseth

(MER 5:45:01023).  Mr. Blixseth voluntarily chose not to appeal within his 14-day window to

do so (MER 2:13:00328 (at 2-3)) or otherwise move to set the judgment aside.[10]

Two weeks after the involuntary bankruptcy petition was filed, Mr. Blixseth paid Idaho

$925,000, or 82% of his overall debt at that time.  (MER 5:47:01030-01031.)  That amount

included his entire tax liability for those three years, with only a partial write-off of penalties and

interest.  (*Id.*; MER 2:13:00328 (at 4-6).)

**(b)      Lack of Evidence of a Dispute.**

As discussed below, the overwhelming evidence of Idaho's claim shifted the burden to

Mr. Blixseth to demonstrate an objective, *bona fide* dispute existed as of the Petition Date.  Mr.

Blixseth declined to produce a single email, letter, fax, or other writing in which he challenged

his self-reported tax liabilities.  His attorney vaguely speculated that written statements may have

been submitted, stating, "I believe that there were—I know there were conversations. Whether

those were followed up with e-mails, I believe there are e-mails"—but no such e-mails were

---

[8] *See* MER 5:28:00980 through MER 5:43:01010.

[9] (MER 5:44:01011).  Idaho did not sue Mr. Blixseth on his 2005 liability because, as of
the date of the lawsuit, Mr. Blixseth had not yet filed his 2005 tax return.  (MER 5:25:00825;
MER 5:44:01011; MER 1:11:00178 (at 12)-00179 (at 14).)  That 2005 tax liability was included
in the involuntary Petition.

[10] Under Rule 12 of the Idaho Rules of Appellate Procedure, Mr. Blixseth had two weeks
to appeal.

produced.  (MER 8:70:01630 (at 24)-01631 (at 3).)  He paradoxically criticized Idaho for not disclosing those writings (MER 8:70:01631 (at 4-8)), when the record shows Idaho answered Mr. Blixseth's subpoena and produced relevant documentation (*see, e.g.,* MER 5:46:01025), and the alleged writings would have come from Mr. Blixseth himself.  Mr. Blixseth claimed telephone calls took place in which disputed issues were raised, but as with California, all of the testimony involved generalized, inadmissible hearsay regarding alleged discussions by others, not by his attorney or Mr. Blixseth, and no documentation, independent corroboration, or any meaningful detail whatsoever was provided to substantiate a discussion of disputed issues.  (*See, e.g.,* MER 8:70:01630 (at 2-6) ("I was aware there was some back and forth that took place…in the context of an overall—of numerous complex issues").)

Indeed, as with California, there was no evidence whatsoever beyond Mr. Blixseth's allegations.  The sworn tax returns were his own.  Nowhere did he offer any specificity as to the particular line items in his returns which may be wrong.  (MER 8:70:01634 (at 19-23).)

(c)      <b>Idaho's Collections-Motivated Settlement Discount</b>.

The Bankruptcy Court's only basis for concluding Idaho's claim was disputed was itself an argument—that by discounting its claim postpetition, Idaho implicitly conceded the amount was disputed.  (MER 1:1:00014.) The record contains no evidence for this assumption of a concession—not one email exchange with the authorities, Idaho document, or other proof.

Instead, the sole evidence regarding Idaho's motivations consists of the Settlement Agreement Summary prepared by Idaho pursuant to governing Idaho law.  (*See* Idaho Code §63-3048(b)(3).)  Under "Reasons for Settlement," Idaho's attorney checked the box, "Doubt as to Collectability"—not the box, "Doubt as to Liability."  (MER 5:46:01028.)  In his long-form explanation, the attorney said collectability was the State's sole concern:

> Taxpayer offers to pay $925,000 in complete settlement of the tax assessment. Taxpayer is located outside Idaho and the Commission has no real way to collect. The Commission has obtained a default judgment against taxpayer in Idaho state court, but this had no effect.  Finally, the Commission joined with the states of California and Montana and filed an involuntary bankruptcy petition against taxpayer which finally got him to contact the Tax Commission to discuss settlement.  Though taxpayer may have a substantial amount of assets located in other states, he is allegedly transferring them to his son.  The trustee of the Yellowstone Club has a $44 million judgment against the taxpayer.  That is on appeal to the 9th Circuit Court of Appeals but if it is upheld the Tax Commission will have difficulty in collecting any of the tax obligation.  Unlike a bankruptcy trustee it does not have the power to pursue assets outside the state and the country.  Thus, the Commission may end up writing off the entire assessed amount.  With this agreement the Commission will write off $199,772 ($1,124,772-$925,000).

(MER 5:46:01028-01029.)   Consequently, the only evidence before the Bankruptcy Court demonstrated Idaho accepted a lesser sum because Mr. Blixseth had made himself judgment-proof, not due to a dispute regarding liability or amount.

That Summary also demonstrates Mr. Blixseth never contacted Idaho to voice a dispute before the Petition was filed.  Mr. Blixseth speculated there was contact, but the Summary above, prepared contemporaneously with settlement, states, "…the Commission joined with the States of California and Montana and filed an involuntary bankruptcy petition against taxpayer which finally got him to contact the Tax Commission to discuss settlement."  (MER 5:46:01028)  Such statements can only be read as evidence that no *bona fide* dispute existed on the Petition Date between Mr. Blixseth and Idaho.

### 3.  The Montana Claim.

MDOR's claim arises from a disallowed $1,800,000 tax deduction which Mr. Blixseth conceded and did not appeal.  Mr. Blixseth's concession of tax liability arose from MDOR's audit of Mr. Blixseth's Montana individual income tax returns (and related Blixseth business entities) for tax years 2002 to 2006.  (MER 7:67:01450, ¶5.)  Also included in the audit were

joint filings of Mr. Blixseth and his then-spouse, Edra Blixseth (and related Blixseth business entities) for tax periods ending December 31, 2003, to December 31, 2005.  (*Id.*)  MDOR's audit included two business entities (among others) that impacted MDOR's claim: Yellowstone Development, LLC, and Blixseth Group, Inc.  (MER 7:67:01451, ¶6.)

Based on an audit of Mr. Blixseth's 2002-2006 Montana individual income tax returns, MDOR issued its deficiency assessment to Mr. Blixseth on July 29, 2009.  (MER 6:51:01131-01142; 3:14:00480 (at 4-10); 7:67:01451, ¶10; 7:68:01464, ¶9.)  Mr. Blixseth conceded one specific audit item, i.e., the disallowance of his deduction in the 2004 return of an environmental penalty paid by one of his pass-through entities.  In the deficiency assessment, MDOR stated:

> **Audit Issue #4-Environmental Penalty Payment**
> In 2004, Yellowstone Developments was cited for a Clean Water Act violation due to the discharge of pollutants into a waterway.  Yellowstone Development was assessed a civil penalty in the amount of $1,800,000.  Yellowstone Development erroneously deducted this amount on their 2004 Montana and Federal tax returns. As is clearly stated in the consent decree dated, December 29, 2004, Civil Action No. CV 04-58-BU-RWA subsection I Jurisdiction and Venue paragraph 19:
>
>> Civil penalty payments pursuant to this Consent Decree (including stipulated penalty payments under Section VIII) are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. §162(f), or of 26 C.F.R. §1.162-21 and are not tax deductible expenditures for purposes of federal law.
>
> IRC §162(f) states:
>
>> No deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law.
>
> The deduction for the environmental penalty payment and other related expenses is disallowed in the amount of $2,678,582 as an improper deduction reported on the "Other Deductions" line of the 2004 Federal Form 1065.  Denial of the deduction increased Yellowstone Development's income, which in turn increased Blixseth Group, Inc.'s income.  The cumulative effect increased Federal adjusted gross income and Montana adjusted gross income reported by you and Ms. Blixseth for tax year 2005.  These adjustments are highlighted on the attached revised 2005 Montana Form 2 for you and Ms. Blixseth.

(MER 6:51:01137; citing 6:50:01109, ¶19.)   MDOR's deficiency assessment also advised Mr. Blixseth that he had 30 days from the date of the assessment to object, or be deemed to agree with the assessment's findings.  (MER 6:51:01141.)

Mr. Blixseth timely requested an informal review of the deficiency assessment with MDOR.  (3:14:00481 (at 23)-00482 (at 7).)   During the review, MDOR received additional information from Mr. Blixseth's representatives through document submissions and telephonic conferences, the last of which occurred on February 3, 2010.  (MER 6:53:01147; 7:67:1454-1455, ¶25; 3:14:00482 (at 8-11).)  MDOR's auditor, Spencer Marks, testified at the hearing that, during the informal review, "Mr. Blixseth's counsel agreed that they were not going to contest the disallowance of the environmental penalty payment deduction."  (MER 3:14:00415 (at 8-12).)  Mr. Marks' manager, Peter Donnelly, testified that MDOR worked with Mr. Blixseth's accountants and attorneys in reviewing the environmental penalty deduction based on information Mr. Blixseth's representatives provided.  (MER 3:14:00482 (at 9-14).)  Specifically, MDOR determined that $878,582 of the originally claimed $2,678,582 were legitimate deductible environmental expenses.  (MER 3:14:00482 (at 15-18).)  Thus, in working with Mr. Blixseth's representatives, MDOR reduced the disallowance of the environmental expenses in Audit Issue #4 to the remaining $1,800,000 environmental penalty.  Mr. Donnelly also testified that Mr. Blixseth's accountant or attorney conceded that audit issue.  (MER 3:14:00486 (at 20-22).)  MDOR issued its final deficiency assessment on March 3, 2010.  (MER 6:53:01147-1149.)

In the final deficiency assessment, MDOR addressed the environmental penalty audit issue, stating:

> In tax year 2004, Yellowstone Development, LLC was cited for a Clean Water Act violation due to the discharge of pollutants into a waterway.   Yellowstone Development, LLC was assessed a civil penalty in the amount of $1,800,000.  This fine was deemed an IRC §162 (f) penalty via Civil Action No. CV 04-58-BU-

> RWA, and is thereby a non-deductible government penalty payment.  In tax year 2004, Yellowstone Development, LLC incorrectly deducted the $1,800,000 penalty payment as an "other deduction" used to arrive at ordinary business income.  On Yellowstone Development, LLC's 2004 federal Form 1065, the $1,800,000 amount was combined with other "environmental expenses" of $878,582, for a total of $2,678,582 deducted.   Previously, we were unsure as to what items of expense were encompassed in the $878,582 and what, if any, of the amounts were legitimate expenses.  Through various documents, we have now confirmed that the $878,582 is composed of legitimate deductible items.   Therefore, we have adjusted the entity's tax return to reflect the allowable deduction.

(MER 6:53:01148; 3:14:00482 (at 12-17).)  MDOR's final deficiency assessment also advised Mr. Blixseth that he had 15 days to request a review of the assessment or his appellate rights would be forfeited. (MER 6:53:01149.)

MDOR filed warrants for distraint according to §15-1-703, MCA, for Mr. Blixseth's entire tax liability in Madison County on March 15, 2010 and in Gallatin County on April 6, 2010.   (MER 6:54:01150-1152; 6:55:01153-1154; 7:69:01476, ¶3-4.)   On March 18, 2010, MDOR's Office of Dispute Resolution (the agency's internal tax appeal office) received a completed Form APLS102F from Mr. Blixseth's counsel, Justin Jones, thereby initiating an appeal of the assessment.   (MER 6:59:01230-1235; 7:67:01455, ¶26; 7:68:01465, ¶13.) However, Mr. Blixseth specifically appealed Audit Issues #1, 2, 3, 5, 6, 7, and 8.   (MER 6:59:01231-01235.)   Notably, and consistent with his representatives' previous concession during the informal review process, Mr. Blixseth did not dispute or appeal Audit Issue #4. (MER 6:59:01231-1235; 7:67:01455, ¶26; 7:68:01465, ¶13.)

Mr. Blixseth subsequently confirmed his concession of Audit Issue #4 in a sworn statement in response to MDOR's discovery requests.  (MER 7:62:01394.)  There, MDOR asked Mr. Blixseth, "Please admit that you improperly deducted on your 2004 federal tax return, Form 1065, $1,800,000.00 that was paid by Yellowstone Development, LLC, for an environmental

penalty based upon a Clean Water Act Violation issued by the Federal Government."  (MER

7:62:01371, Request for Admission No. 2.)  Mr. Blixseth responded as follows:

> The Taxpayer is an individual and does not file Form 1065, accordingly the request
> is denied (see general and specific objections to definitions above).  However, the
> Taxpayer does admit that he has not challenged the MDOR's determination
> regarding the deductibility of certain civil penalties paid by the Yellowstone
> Mountain Club, LLC [*sic* – Yellowstone Development, LLC] in 2004 that passed–
> through and were reported, in part, on his personal federal income tax return for
> 2004.

(MER 7:62:01370.)

On January 7, 2011, MDOR wrote to Mr. Blixseth, stating, "If the total amount due

associated with the uncontested portion of your audit liability is not paid within 30 days from the

date of this letter, the Department will begin collection activities in order to satisfy the debt."

(MER 6:52:01143-1146; 7:67:01455, ¶28; 7:68:01464-1465, ¶11-12.)  MDOR attached to the

letter a Statement of Account including the amount due, broken down by tax, penalty, and

interest, as well as the statement, "If the total due is not paid within 30 days of the date of this

statement of account, we may issue a warrant for distraint (judgment/tax lien) against you."

(MER 6:52:01145; 7:67:01455, ¶28; 7:68:01464-1465, ¶11-12.)  MDOR received no response to

the January 7, 2011 statement.  (MER 7:68:01465, ¶12.)

At the bankruptcy dismissal hearing, Mr. Marks explained the straightforward

mathematical computations used to calculate Mr. Blixseth's undisputed tax liability from Audit

Issue #4 for use in the Statement of Account.  (MER 7:67:01453-1454, ¶17-24.)  MDOR simply

added the income that was improperly deducted back into Mr. Blixseth's tax returns.  (MER

7:67:01453, ¶18; 7:68:01467, ¶24.)  All other items on the returns for Mr. Blixseth, Blixseth

Group, Inc., and Yellowstone Development, LLC were exactly as Mr. Blixseth reported them to

MDOR in his original sworn returns.  (*Id.*)  By applying the conceded disallowance to the values

sworn to by Mr. Blixseth as true, correct, and complete, MDOR arrived at the liability that Mr. Blixseth owed as a result of his concession on Audit Issue #4 alone.  Mr. Marks also explained the penalty and interest calculations to determine the total undisputed liability as of the Petition Date.  (MER 7:67:01460-1461, ¶64-65.)

Shortly after MDOR issued the January 7, 2011 letter and statement, Mr. Blixseth and MDOR entered into a Stipulation on January 14, 2011, to move the pending Office of Dispute Resolution appeal to the State Tax Appeals Board (STAB), a quasi-judicial board that is independent of the MDOR.  (MER 6:56:01155-1157.)  Specifically, the Stipulation provides:

> The Parties agree that the Department's decision is final for the individual income tax audit for the tax years 2002 through 2006 for purposes of §15-2-302, MCA, as of the date the Office of Dispute Resolution closes this proceeding by order accepting this Stipulation, and that the Taxpayer may take a *de novo* appeal of this matter to the State Tax Appeal Board under §15-2-302(1)(a), MCA, or as otherwise authorized by Montana law.

(MER 6:56:01156, ¶5.)

On February 10, 2011, Mr. Blixseth filed his Complaint with STAB ("STAB Complaint").  (MER 6:57:01158-1200; 7:67:01456, ¶30.)  Therein, Mr. Blixseth conceded Audit Issue #4 three times: first, Mr. Blixseth stated, "In all but one case, the Taxpayer disputes the Department's determination with respect to taxes, penalties and interest regarding the Audit Issues and the resulting Montana tax liability," (MER 6:57:01160, ¶9); second, Mr. Blixseth referred to Audit Issue #4 as, "the single, undisputed Audit Issue – the deductibility of a civil penalty paid with respect to an alleged violation of the Clean Water Act ("Audit Issue 4")…" (MER 6:57:01160-1161, ¶9); and third, in Count 4, Mr. Blixseth stated, "The Taxpayer does not dispute the fourth Audit Issue in the Notice of Deficiency ("Audit Issue 4"), the Department's finding that Yellowstone Development, LLC erroneously deducted a $1,800,000 civil penalty on its 2004 partnership return." (MER 6:57:01165, ¶31.)  During the hearing, Mr. Blixseth agreed

that he authorized the statements in the STAB Complaint.  (MER 2:13:00359 (at 15-16).)  Mr. Blixseth went on to reiterate his concession, stating "I think we gave up on Audit Issue No. 4." (MER 2:13:00364 (at 16).)  Mr. Blixseth also confirmed that he was unaware of any filings that changed his position with respect to Audit Issue #4.  (MER 2:13:00369 (at 9-11).)

MDOR filed the involuntary Petition (along with the two other original Petitioning Creditors) on April 5, 2011.  (MER 1:3:00039).  The basis of MDOR's claim was the conceded, non-appealed, and undisputed debt arising from Audit Issue #4 in the amount of $219,258.  (*Id.*)  Mr. Blixseth offered no evidence at hearing to demonstrate that MDOR's calculations were incorrect or that supported his contention that MDOR's Petition claim would ever be less than it was on the Petition Date.

### 4.    Requisite Number of Creditors for an Involuntary Filing.

To determine the exact number of Mr. Blixseth's creditors, MDOR conducted pre-hearing discovery.  Mr. Blixseth produced a list of alleged creditors with the following qualification:

> Mr. Blixseth will answer Interrogatory No. 1 by identifying a sufficient number of his creditors under 11 U.S.C. §303(b) that he believes to be undisputed but not necessarily undisputed as to amount as of the petition date….Mr. Blixseth's identification of the requested claimants is without regard (and therefore without prejudice) to whether the claimant's claim has matured, was past due or in default as of the petition date. (MER 7:63:01397 (at 23-25).)

Mr. Blixseth provided a collection of bills and invoices at the hearing to support his alleged creditors' claims. However, the documents showed that Mr. Blixseth had already paid, prior to April 5, 2011, the following six creditors:

- Neiman Marcus was paid March 24, 2011; (MER 7:64:01403); (MER 8:70:01524 (at 5-10);

- City of Medina was paid March 8, 2011;  (MER 7:64:01423); (MER 8:70:01559 (at 22-25);

- Puget Sound Energy was paid March 20, 2011; (MER 7:64:01406); (MER 8:70:01531 (line 25) – 01532 (line 1));

- Comcast was paid on March 9, 2011; (MER 7:64:01413-1414); (MER 8:70:01533 (at 14-25);

- Medina Gardening and Landscape, Inc. was paid on or before March 10, 2011 (through an over-payment in a prior month);  (MER 7:64:01405); (MER 8:70:01529 (at 13-15);

- US Bank was routinely paid before the due date by Mr. Blixseth in excess of the estimated amount due; (MER 7:64:0419); (showing a $55,000 pre-payment on a $36,728.57 balance in the prior month); (MER 8:70:01543 (at 20-22); 01544 (at 22) – 01545 (at 2);

Mr. Blixseth's documentation also strongly suggested he had already paid the following

five creditors:

- Big Horn Golf Club, due and owing on March 31, 2011, and by his testimony, generally "paid on time;" (MER 7:64:01422); (MER 8:70:01557 (at 14-23));

- Qwest, due and owing on April 7, 2011 but showing a handwritten entry by Mr. Blixseth's wife of the amount paid and the stamp, "Posted 4/1/11;" (MER 7:64:01425); (MER 8:70:01554 (at 1-10);

- Lewis Cellars, due and owing on March 24, 2011 and showing the stamp, "Posted 3/29/11;" (MER 7:64:01426-01427); (MER 8:70:01564 (at 15-25);

- TransAmerica, due and owing on March 24, 2011 and showing the stamp, "Posted 3/28/11;"  (MER 7:64:01429); (MER 8:70:01573 (at 6-17);

- ADT, showing the stamp, "Posted 3/25/11;" (MER 7:64:01424); (MER 8:70:01563 (at 12-15);

Additionally, the following purported creditors listed by Mr. Blixseth could not be

qualifying creditors under §303(b)(2) because each received avoidable transfers:

- City of Medina: Mr. Blixseth testified the debt related to remodeling work on property owned by a third party, Kawish LLC.  (MER 8:70:01560 (line 14) – 01561 (line 17).) The invoice was sent to "Blixseth/Kawish LLC" (MER 7:64:01423), but Mr. Blixseth was merely a point person on Kawish's behalf.  There is no evidence of a claim owed by Mr. Blixseth to City of Medina.

- ADT:  The one invoice produced for ADT is dated March 21, 2011 for quarterly services. (MER 7:64:01424).)  Mr. Blixseth testified that those security services were for offices in

Rancho Mirage, California, owned by Desert Ranch LLLP. (MER 8:70:01562 (at 3-12); 01563 (at 18-20)).) Consequently, no value was received by Mr. Blixseth for this payment.

- Chubb: The evidence (MER 7:64:01430-01438) and testimony confirmed that the insurance policies were for yachts, vehicles, and real property owned not by Mr. Blixseth, but by his wife, Desert Ranch LLLP, and Kawish LLC. (MER 8:70:01577 (at 14); 01579 (at 8-12); 01580 (at 1-7).) There is no evidence of a claim owed by Mr. Blixseth to that insurer.

- US Bank: Mr. Blixseth testified that his ordinary course of dealing was to prepay the account or pay on time so no interest would accrue. MER 8:70:01539 (line 6) – 01545 (line 23).) However, as the invoices at the hearing demonstrated (MER 7:64:01418), Mr. Blixseth incurred interest charges in the prepetition portion of 2011. (MER 8:70:01539 (line 6) – 01545 (line 23).) Given the dates of the invoices, the partial or late payment that caused the accrual of interest had to have occurred within the 90 days prior to the Petition Date. *Id.*

- Qwest: The invoice Mr. Blixseth produced is dated March 19, 2011 and shows a balance due of $398.88, a balance forward of $196.25, and a late payment charge of $2.38. To the extent payment was made before the Petition Date, Qwest is not a qualifying creditor because no debt was owed.

- Big Horn Golf Club: The invoice dated February 28, 2011 showed a balance due of $504.15. To the extent a payment was made after the Petition Date, that payment is voidable under §549 as an unauthorized postpetition transfer.

- Prudential Life Insurance: The March 25, 2011 invoice shows a balance due as a life insurance premium payment for the period April 20 to July 19, 2011. (MER 7:64:01428.) To the extent the invoice was paid after the Petition Date, that payment would be voidable under §549 as an unauthorized postpetition transfer.

- TransAmerica Life Insurance: The due date for the premium was March 24, 2011. (MER 7:64:01429.) To the extent a payment was made after that date, the payment is voidable under §547 as a prepetition preferential payment. To the extent TransAmerica had outstanding charges paid after the Petition Date, such payment is voidable under Bankruptcy Code §549 as an unauthorized postpetition transfer.

- Lewis Cellars: The invoice due date was March 24, 2011. (MER 7:64:01427.) To the extent a payment was made after that date but before the Petition Date, it is voidable under §547 as prepetition preferential payment. To the extent it was paid after the Petition Date, it is voidable under §549 as an unauthorized postpetition transfer.

- Mack, Roberts & Co.; Mike Flynn, Stillman & Associates; Rosen Law; Hagen & O'Connell: Mr. Blixseth testified that most of the amounts paid to these firms were for prepetition services. (MER 8:70:01587 (at 15-19).) Mr. Blixseth testified that the

amounts due and owing as of the Petition Date were later paid post-petition (MER 8:70:01651 (line 20) – 01652 (line 3).), thereby making all five professional entities recipients of avoidable transfers under §549.

**IV.**
**ARGUMENT**

**A.     There Was No *Bona Fide* Dispute as to the California Claim.**

When a petitioning creditor's eligibility is challenged in an involuntary bankruptcy, its eligibility is assessed as of the time of the filing of the petition, not thereafter. *Vortex Fishing*, 277 F.3d at 1065; *In re Hentges*, 350 B.R. 586, 601 (Bankr. N.D. Okl. 2006); Hon. J. Lee, 2 Bankr. Service L. Ed. §13:212 (Jan. 2013).  Here, that means the critical question is whether, as of the Petition Date (i.e., April 5, 2011), Mr. Blixseth had any real dispute and had notified California of such dispute.  He had not.

As set forth in Section III(C)(1) above, Mr. Blixseth's California tax liability was based on his own self-reported income tax return.  At no time before the Petition Date did Mr. Blixseth protest the resulting assessment or indicate in any filing or correspondence that he had any objection to the determination of liability or amount.  After the Petition was filed, he entered into a settlement agreement by which he paid every penny of the assessed amount, including penalties and interest.  Blixseth's only evidence presented of any dispute was the postpetition Recital B of Mr. Blixseth's settlement agreement with California.  (MER 1:11:00169 (at 3-6).) The Bankruptcy Court inexplicably seized on that Recital—and nothing else—in concluding the California assessment was disputed, asking "why sign an agreement that contains known lies?" (MER 1:1:00014-00015.)  However, the Recital simply states Mr. Blixseth asserted a dispute, not that California agreed with that assertion, nor that the alleged dispute was *bona fide*, nor what the nature of the dispute was, nor that the dispute existed as of the Petition Date.  (MER 4:24:00821.)

Moreover, at the time the settlement agreement was signed, Mr. Blixseth had every reason to suddenly claim he disputed the assessment. He was angling to defeat the involuntary case by paying off one of the Petitioning Creditors in full shortly after the Petition was filed. California likewise had no reason not to sign an agreement containing the Recital, since it was making no admission and receiving full payment. In the context of Mr. Blixseth paying the entire California claim after never having raised a pre-Petition objection, that Recital has no practical evidentiary impact on whether the claim was disputed on the Petition Date. A 100% payment with no prior record of any asserted dispute is, if anything, persuasive evidence that the claim was undisputed. *See In re Faberge Restaurant of Florida, Inc.,* 222 B.R. 385, 388 (Bankr. S.D. Fla. 1997) ("the postpetition payment evidences that there is no *bona fide* dispute between the Debtor and petitioning creditor as to the amount paid").

Under binding Ninth Circuit precedent—and overwhelming case law everywhere—it is a "rather obvious proposition" that a debtor may not deprive the Bankruptcy Court of jurisdiction by paying off petitioning creditors.[11] That is exactly what Mr. Blixseth attempted below, and what the Bankruptcy Court errantly permitted. Mr. Blixseth went to a creditor and offered

---

[11] *See, e.g., Vortex Fishing,* 277 F.3d at 1064-65 (9th Cir. 2002) (citing *Reed v. Thornton,* 43 F.2d 813, 813 (9th Cir. 1930)) (emphasis added); *Faberge Restaurant,* 222 B.R. at 388 ("Policy reasons, and other considerations, dictate that the postpetition payments will not deprive the court of jurisdiction or require dismissal of the petition"); *In re Braten,* 99 B.R. 579 (Bankr. S.D.N.Y. 1989) ("A creditor's withdrawal…does not cause the petition to be insufficient *ab initio* for lack of the requisite number of eligible creditors under 11 U.S.C. § 303(b)(1)"); *In re Carvalho Industries, Inc.,* 68 B.R. 254, 256 (Bankr. D.Ore. 1986); *In re Claxton,* 21 B.R. 905, 908-09 (Bankr. E.D.Va. 1982); *In re Sjostedt,* 57 B.R. 117, 120 (Bankr. M.D.Fla. 1986) ("It is well settled that the fact that a creditor is paid post petition and withdraws his joinder in an involuntary case does not render the petition insufficient for lack of sufficient number of eligible creditors under § 303(b)(1)."); 2 COLLIER ON BANKRUPTCY ¶ 303.14[10] (16th ed. 2011) (a debtor cannot "defeat an involuntary petition by paying the debts owed to one or more of the petitioning creditors").

payment in full, obtaining a gratuitous recital that the debtor disputed the claim solely to pursue dismissal.

To be clear, the issue is not one of credibility or a weighing of the facts.  The facts are undisputed, which is why the Bankruptcy Court felt it could grant summary judgment.  Quite simply, a recital of a dispute in a post-petition settlement coupled with payment in full, and no other evidence of a dispute, cannot establish a *bona fide* dispute for purposes of §303(b)(1).  The Bankruptcy Court erred in holding otherwise.

**B.      There Was No *Bona Fide* Dispute as to the Idaho Claim.**

The Idaho claim, like the California claim, was based on Mr. Blixseth's sworn returns. Pre-Petition, Mr. Blixseth never submitted a protest or set forth anything in writing objecting to the claim.  He never identified any particular flaw in the assessment or calculation.  Nor did Mr. Blixseth respond when Idaho sued him and obtained a judgment, or appeal that judgment.[12]  The Bankruptcy Court nonetheless decided there was a *bona fide* dispute based solely on a discounted post-Petition payment—i.e., 82% of the entire claim, including interest and penalties, was paid.  The Court concluded, "The willingness to take a discount in light of Blixseth's denial of liability provides strong evidence that a dispute existed; otherwise, why settle?"  (MER 1:1:00014.)  Of course, Blixseth had neither protested nor denied his liability pre-Petition, and the Bankruptcy Court ignored the only competent evidence on the "Why settle?" question.  The only relevant document in the evidentiary record, an internal writing by Idaho's attorney, confirms the discount was accepted to avoid the risk of the entire debt being uncollectible. (MER 5:46:01028-01029.)  The settlement had nothing to do with any previously-unexpressed

---

[12] That judgment alone establishes the lack of a dispute under the *per se* rule in *In re Marciano* 708 F.3d 1123 (9th Cir. 2013).  See Section IV(E), *infra*.

dispute of the assessment.  The Bankruptcy Court's conclusion is wholly unsupported by the pre-Petition facts surrounding the Idaho claim.

Here, the Bankruptcy Court inextricably ignored the reality that creditors frequently accept a discounted cash payment even when there is no dispute as to liability or amount, in lieu of continuing to litigate (and accumulate legal fees) and facing the risks of payment over time or of non-payment.  Here, with an assessment based on Mr. Blixseth's sworn returns, no written evidence of any objection, and a valid court judgment, that is exactly what Idaho did (as set forth in Ex. BB), and there is no evidence to the contrary.  As such, the Idaho claim was not subject to a *bona fide* dispute as of the Petition Date.  The Bankruptcy Court erred in holding otherwise.

**C.      There Was No *Bona Fide* Dispute as to the Montana Claim.**

As of the Petition Date, under Montana tax law, MDOR's claim against Mr. Blixseth was final and subject to immediate enforcement and collection.  By failing to appeal Audit Issue #4, and by repeatedly conceding the same, Mr. Blixseth could no longer dispute MDOR's claim under governing state law as of the Petition Date.

> *1.      MDOR followed its own procedures to notify Mr. Blixseth of his undisputed tax liability and to demand payment.*

MDOR's tax procedure is clearly established in its administrative rules (referred to herein as the "Administrative Rules of Montana" or "ARM"), of which Mr. Blixseth received notice at every turn.  When MDOR audited Mr. Blixseth's 2002-2006 Montana individual income tax returns and determined that a greater amount than the amount disclosed on the return was due, MDOR issued a deficiency assessment to Mr. Blixseth on July 29, 2009.  (MER 6:51:001131-1142; 3:14:00480 (at 4-10); 7:67:01451, ¶10; 7:68:01464, ¶9.)   A deficiency assessment is defined as "an amount greater than the amount disclosed on a return or report filed with the department."  ARM 42.2.304(11).  When MDOR issues a deficiency assessment, ARM 42.2.510

specifies what procedure MDOR must follow.  ARM 42.2.2.510(1) ("This rule applies to all department actions where a statement of account (SOA) or deficiency assessment, as defined in ARM 42.2.304, is issued.")

Specifically, when MDOR advised Mr. Blixseth of the deficiency assessment associated with Audit Issue #4, MDOR applied the following requirement:

> The department will provide notification to the customer by mailing the SOA as defined in ARM 42.2.613, to the customer as prescribed in 15-1-211, MCA. Information provided on the SOA shall advise the customer of the requirement to file a Request for Informal Review Form APLS101F or a written objection to the SOA with the department within 30 days from the date of the SOA; and that failure to file a written objection within the 30 days shall be deemed an admission that the customer agrees the debt stated in the SOA is due and owing.

ARM 42.2.510(2).  Notably, the use of the term "SOA" in this context includes deficiency assessments, given that subsection (1) applies the rule to the issuance of both statements of account and deficiency assessments.  Thus, MDOR advised Mr. Blixseth:

> Appeal rights
> You have 30 days from the date of this letter to notify the Department in writing that you object to the assessment.  Failure to file a written objection within 30 days shall be deemed an admission that you agree with this assessment.  ARM 42.2.510. If you object to the assessment, §15-1-211, MCA allows for you to provide the basis for your objections in writing, by telephone, or if requested, at an informal conference.

(MER 6:51:1141.)   Mr. Blixseth timely requested an informal review of the deficiency assessment and submitted additional information to MDOR through document submissions and telephonic conferences, the last of which occurred on February 3, 2010.  (MER 6:53:01147; 7:67:01454-1455, ¶25; 3:14:00481 (at 23)-00482 (at 11).) Thus, MDOR issued its final deficiency assessment on March 3, 2010, in accordance with the 30-day requirement in administrative rule, which states:

> The department shall review the objection and determine whether the department agrees or disagrees with the customer's objections. The department shall mail written notice to the customer advising the customer of the department's determination within 30 days after receipt of the objection.

ARM 42.2.510(5).   (MER 6:53:01147-1149; 7:67:01454-1455, ¶25; 7:68:01464, ¶10.)   MDOR

also advised Mr. Blixseth of his appeal rights in the final deficiency assessment, stating:

> If you disagree with this determination, you can send a written request for review or Form APLS102F to the Department's Office of Dispute Resolution within 15 days of the date of this letter.  If a written objection is not received in the time allowed, you will forfeit your appeal rights.  A copy of Form APLS102F is enclosed.  This form is also available in the downloadable forms section of our website www.revenue.mt.gov. A notice of objection pursuant to Section 15-1-211, MCA should be mailed to the Department at the following address: Office of Dispute Resolution, Montana Department of Revenue, PO Box 7701, Helena MT 59604-7701.

(MER  6:53:01149.)    That  notice  to  Mr.  Blixseth  fulfilled  the  obligations  stated  in  the

administrative rule:

> If the department disagrees with the customer, it shall explain the reasons for the disagreement, notify the customer of the dispute resolution procedures and provide a copy of Notice of Referral Form (APLS102F). The department shall also notify the customer that the customer must submit a APLS102F or detailed letter to the department within 15 days of the date on the Notice of Determination from the department, and that the customer will forfeit the right to a hearing if the customer fails to submit the APLS102F or detailed letter within the 15-day period.

ARM 42.2.510(5)(b).  Consistent with the required notice provision above, the rule goes on to

explain the requirements for a taxpayer to appeal to the Office of Dispute Resolution:

> Appeals  shall  be  submitted  to  the  Office  of  Dispute  Resolution  if  the  customer decides to appeal the department decision, as required in 15-1-211, MCA. This may be  done  by  completing  the  APLS102F,  or  by  providing  a  detailed  letter  and submitting either document to the department within 15 days of the date of the Notice  of  Determination  from  the  department.  Appeals  should  be  sent  to  the Department of Revenue, Office of Dispute Resolution, P.O. Box 7701, Helena, Montana 59604.

ARM 42.2.510(6).  Because MDOR's final deficiency assessment was dated March 3, 2010, Mr.

Blixseth's last day to appeal to the Office of Dispute Resolution was March 18, 2010.

> 2.    *Mr. Blixseth's failure to appeal MDOR's Audit Issue #4 determination and assessment of tax liability rendered that determination and assessment indisputable and immediately collectable.*

As stated in ARM 42.2.510(6)(a), "Failure to file an appeal by the customer within 15 days of the date of the Notice of Determination by the department shall be deemed an admission that the customer concurs that the debt stated in the SOA is due and owing."  In his March 18, 2010 appeal to the Office of Dispute Resolution, Mr. Blixseth specifically appealed Audit Issues #1, 2, 3, 5, 6, 7, and 8.  (MER 6:59:01231-1235.)  Mr. Blixseth did not dispute or appeal Audit Issue #4.  (MER 6:59:01231-1235; 7:67:01455, ¶26; 7:68:01465, ¶13.)  Therefore, based on Mr. Blixseth's failure to appeal Audit Issue #4, under ARM 42.2.510(6)(a), Mr. Blixseth effectively admitted that the debt in the deficiency assessment regarding Audit Issue #4 was due and owing.

MDOR issued its demand for payment of the Audit Issue #4 liability on January 7, 2011, stating, "If the total amount due associated with the uncontested portion of your audit liability is not paid within 30 days from the date of this letter, the Department will begin collection activities in order to satisfy the debt."  (MER 6:52:01144; 7:67:01455, ¶28; 7:68:01464-1465, ¶11-12.)  MDOR included a bill, in the form of a Statement of Account, that stated the amount due, broken down by tax, penalty, and interest, as well as the statement, "If the total due is not paid within 30 days of the date of this statement of account, we may issue a warrant for distraint (judgment/tax lien) against you."  (MER 3:14:00492 (at 18-25); 6:52:01145; 7:67:01455, ¶28; 7:68:01464-1465, ¶11-12.)  The procedure under ARM 42.2.510(6) identifies the next steps: "(b) If the customer pays the bill, the matter is resolved.  (c) If the customer does not pay the bill, the matter will be referred to ARC [Accounts Receivable and Collections] for collection."  Also under this administrative rule, if the taxpayer does not respond to an SOA (or deficiency assessment) in the first instance, "a letter will be sent to the customer requesting payment within 30 days of the date of the letter or a warrant for distraint may be issued pursuant to 15-1-702, MCA."  ARM 42.2.510(2)(b).

Procedurally, for Audit Issue #4, the parties were situated at ARM 42.2.510(6)(a), with Mr. Blixseth's failure to timely appeal Audit Issue #4.  There is no administrative provision for appealing a bill issued by MDOR after the taxpayer fails to appeal MDOR's final audit assessment under ARM 42.2.510(6).  For MDOR, this was not a unique situation, and MDOR has followed this procedure with other taxpayers.  (MER 3:14:00492 (at 7-14).)

3.     *Mr. Blixseth's appeal to the State Tax Appeals Board did not resurrect a possible dispute after Mr. Blixseth's previous concessions and failure to appeal Audit Issue #4.*

Mr. Blixseth argued below that the Stipulation between the parties to conclude litigation before the Department evidenced his disagreement with MDOR's January 7, 2011 demand for payment.  Yet, the plain language of the Stipulation demonstrates otherwise.  Specifically, the Stipulation provides:

> The Parties agree that the Department's decision is final for the individual income tax audit for the tax years 2002 through 2006 for purposes of §15-2-302, MCA, as of the date the Office of Dispute Resolution closes this proceeding by order accepting this Stipulation, and that the Taxpayer may take a *de novo* appeal of this matter to the State Tax Appeal Board under §15-2-302(1)(a), MCA, or as otherwise authorized by Montana law.

(MER 6:56:01156, ¶5.)   The "matter" pending before the Office of Dispute Resolution, designated Cause No. 10-043-IT, did not include Audit Issue #4, as shown by Mr. Blixseth's own pleading filed with the Office of Dispute Resolution.  The Stipulation itself made no mention of Audit Issue #4, nor did it contain any suggestion that Mr. Blixseth was resurrecting that issue, notwithstanding his previous concessions.  Before STAB, Mr. Blixseth again conceded Audit Issue #4, characterizing Audit Issue #4 as, "the single, undisputed Audit Issue – the deductibility of a civil penalty paid with respect to an alleged violation of the Clean Water Act ("Audit Issue 4")…" (MER 6:57:01160-1161, ¶9); and stating, "The Taxpayer does not dispute the fourth Audit Issue in the Notice of Deficiency ("Audit Issue 4"), the Department's

finding that Yellowstone Development, LLC erroneously deducted a $1,800,000 civil penalty on its 2004 partnership return." (MER 6:57:01165, ¶31.)

At the involuntary hearing, MDOR offered the only evidence presented regarding MDOR's state tax procedures. That evidence demonstrated unequivocally that MDOR followed its administrative rules and that the procedure followed in this instance was neither unique nor unprecedented. Rather, MDOR treated Mr. Blixseth as it has treated other taxpayers and afforded him all due process required under Montana law. Additionally, under Montana law, Mr. Blixseth waived his ability to dispute the tax liability associated with Audit Issue #4 by failing to appeal and repeatedly conceding that issue. MDOR was clearly authorized under Montana law to demand payment of the tax liability and initiate collection procedures for the tax, penalties, and interest associated with Audit Issue #4. Thus, as of the Petition Date, there was no *bona fide* dispute regarding Mr. Blixseth's tax debt to MDOR with respect to Audit Issue #4. The Bankruptcy Court erred in concluding otherwise.

4.     *The Bankruptcy Court Misapplied Montana Tax Law to Reach an Erroneous Legal Conclusion.*

In spite of the uncontroverted evidence and legal authority MDOR presented below, the Bankruptcy Court erroneously concluded that, "Montana has not shown sufficiently that it was either authorized to create a separate liability or claim related to Audit Issue 4 – such as a jeopardy assessment – or that, if authorized, it took the proper steps to separately create and present its claim. And that was its burden." (MER 1:1:00017.) The Bankruptcy Court relied on three authorities to reach this conclusion, none of which actually support such a holding. First, the trial court cited a Pennsylvania bankruptcy case, *In re Blue Coal Corp.*, 166 B.R. 816 (Bankr. M.D. Pa. 1993) to support the contention that "Each tax year represents a separate claim." (MER 1:1:00016.) The bankruptcy court in *Blue Coal Corp.* ruled so in disallowing the Internal

Revenue Service from amending a tax proof of claim after the bar date to add additional tax years.

The Bankruptcy Court then attempted to extrapolate this principal into a prohibition against MDOR collecting on an undisputed and conceded audit issue under Montana law by citing two Montana tax statutes: §§15-30-2604 and -2629, MCA.  (MER 1:1:00016.)  However, §15-30-2604, MCA, is wholly unrelated to collection of tax debts, but instead describes the "time for filing" and "extensions of time" requirements in Montana.  The Bankruptcy Court provided no explanation why it cited this irrelevant Montana statute or why an implied analysis of this law supported the Bankruptcy Court's conclusion.  The Bankruptcy Court further failed to explain why it was MDOR's burden to prove up its administrative procedures in light of Mr. Blixseth's clear, unequivocal admissions as to the liability in Audit Issue #4.

The Bankruptcy Court's reference to §15-30-2629, MCA, is similarly opaque.  Foremost, §15-30-2629(1), MCA requires, "The department shall collect taxes that are delinquent as determined under this chapter."  The remainder of the code section pertains to the timing and requirements applicable to MDOR offsetting a debt, which did not happen in this matter.  Again, how this mandate for MDOR to collect delinquent taxes translates into a prohibition against demanding payment on an undisputed and conceded debt is unclear.

The Bankruptcy Court demonstrated its misunderstanding of Montana tax law and procedure when it incorrectly compared MDOR's demand for payment of the liability for Audit Issue #4 to a "jeopardy assessment."  MDOR issues jeopardy assessments under §15-30-2631, MCA, when MDOR finds that assessment or collection of the tax or deficiency for the taxable year will be jeopardized, in whole or in part, by delay.  MDOR's deficiency assessment against Mr. Blixseth was not issued pursuant to this procedure.  Rather, MDOR issued its deficiency

assessment under §15-30-2642, MCA, and followed its uniform dispute resolution procedure under §15-1-211, MCA, and the administrative rules adopted thereunder, as explained above.

As the undisputed evidence showed, MDOR's actions in this instance were not unique. For example, penalties and interest on unpaid tax debts are calculated from the date the original tax return is due until the tax is paid or the penalty reaches a maximum amount. Sections 15-1-216(2) and (4)(b), MCA. MDOR's ability to demand payment of an undisputed debt benefits Montana taxpayers by allowing them to stop incurring additional interest by paying the undisputed debt.

The facts showing that MDOR followed the procedure described above were not disputed before the Bankruptcy Court. Therefore, the Bankruptcy Court committed a reversible error of law by analyzing two provisions of Montana tax law that are unrelated to the current proceeding while ignoring both MDOR's straight-forward application of its deficiency assessment and demand-for-payment procedures and Mr. Blixseth's admissions of liability in the administrative proceedings. Under a correct legal analysis of Montana's tax procedure, there was and is no *bona fide* dispute with MDOR's demand for payment of Mr. Blixseth's tax debt associated with Audit Issue #4.

**D.    The Bankruptcy Court Failed to Properly Apply the Shifting Burden of Proof Required by *C&C Jewelry*.**

In determining whether a *bona fide* dispute exists, a bankruptcy court is required to employ an "objective test." *In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057, 1064-5 (9th Cir. 2001). The court cannot simply apply a "subjective standard" based on the debtor's opinion as to whether there was a dispute, nor consider "whether the claims were made in good faith." *Vortex Fishing*, 277 F.3d at 1064-65; *see also In re Colon*, 474 B.R. 330 at 387; 2 COLLIER ON BANKRUPTCY ¶ 303.11[3] (16th ed. 2011). As an objective question, this Court reviews the

Bankruptcy Court's determinations as to the Petitioning Creditors' claims *de novo*, as demonstrated above.  (*See* Section II(B), *supra*.)

The Ninth Circuit applies a shifting burden of proof as to whether objections to petitioning creditors' claims in an involuntary case are *bona fide*.  The petitioning creditor bears the initial burden of making a *prima facie* case that its claim is not subject to dispute.  *C&C Jewelry*, 2001 WL 36340326 at *8.  The creditor must make that case based on a preponderance of the evidence.[13]  The *prima facie* standard is met when the creditor presents enough evidence to proceed with its case, meaning there is a sufficient quantum of proof to survive a motion for a directed verdict, if one were brought.  *Greyhound Computer Corp., Inc. v. Int'l Business Machines Corp.*, 559 F.2d 488, 503 n.34 (9th Cir. 1977); *White v. Abrams*, 495 F.2d 724, 729 (9th Cir. 1974).  Once the petitioning creditor meets that burden, the burden shifts to the debtor to present evidence of material facts proving that an objective, *bona fide* dispute existed on the petition date.  *See, e.g., C&C Jewelry*, 2001 WL 36340326 at *8; *In re Byrd*, 357 F.3d 433, 438 (4th Cir. 2004) ("Once Platinum had made its *prima facie* case…, the burden shifted to Byrd to demonstrate the existence of a *bona fide* dispute").[14]

As shown above, in Mr. Blixseth's case, the three initial Petitioning Creditors all presented *prima facie* evidence of undisputed claims.  California and Idaho submitted

---

[13] *See, e.g., In re Dilley*, 339 B.R. 1, 6 (BAP 1st Cir. 2006); *In re Colon*, 474 B.R. 330, 387 (D. P.R. 2012).

[14] *See also In re BDC 56 LLC*, 330 F.3d 111 (2nd Cir. 2003); *In re McGinnis*, 296 F.3d 730, 731-32 (8th Cir. 2002); *In re Dilley*, 339 B.R. 1, 6 (BAP 1st Cir. 2006)*; In re Wishgard*, __ B.R. __, 2013 WL 1774707 at *5 (Bankr. W.D. Pa. 2013); *In re Colon*, 474 B.R. 330, 387 (D. P.R. 2012); *In re Taub*, 439 B.R. 261, 273 (Bankr. E.D. N.Y. 2010); *In re A & J Quality Diamonds, Inc.,* 377 B.R. 460, 463 (Bankr. S.D.N.Y. 2007); *In re Seventh Ave. Properties*, 2013 WL 655871 at *4 (M.D. Tn. 2013) (slip copy); 2 BANKR. SERVICE L. ED. § 13:176 (2013); 2 COLLIER ON BANKRUPTCY ¶ 303.11[3] (16th ed. 2011) ("Once the creditor satisfies its burden, the burden shifts to the debtor to demonstrate that a *bona fide* dispute exists as to either liability or amount").

assessments based on the Mr. Blixseth's own sworn returns, and Idaho followed that up with a state court judgment.  MDOR showed that Mr. Blixseth admitted to and declined to appeal Audit Issue #4, a disallowed environmental penalty deduction which was patently non-deductible under Montana law.  Those *prima facie* showings shifted the burden to Mr. Blixseth to establish that an objective *bona fide* dispute existed. Mr. Blixseth clearly failed to carry that burden in that he presented no evidence as to what objective disputes existed as to the original Petitioning Creditors' claims.

Indeed, it is black-letter law that once the burden shifts, the debtor may not merely:

(1)     "disagree with the amount of the claim," *C&C Jewelry*, 2001 WL 36340326 at *7;

(2)     stake his alleged dispute on his denial alone, *Dilley*, 339 B.R. at 6-7; *In re Narragansett Clothing Co*., 143 B.R. 582, 583 (Bankr. D.R.I. 1992);

(3)     claim a dispute exists when the facts and law are "well-established and not subject to legitimate dispute," *In re Hicks*, 2011 WL 6000861 at *8 (E.D. Tn. 2011) (unpublished) (rejecting the alleged debtor's argument which was based on no "proof other than his own opinion"); or

(4)     fail to bring any credible proof, *Seventh Ave. Properties*, 2013 WL 655871 at *4.

"To assert that a debt is in *bona fide* dispute, a debtor must present *evidence* to support his factual and legal arguments."  *Marciano I*, 459 B.R. at 54 (emphasis added).  As the Ninth Circuit noted in *Focus Media* (in rejecting the debtor's *bona fide* dispute contentions):

> [The debtor] makes only an argument for the *potential* that the amounts would be in dispute. At the stage of summary adjudication, it was incumbent upon [the debtor] to present evidence to support its contention of disputes as to the actual amounts, listed in the reports or otherwise at issue, not merely to speculate how such claim could, potentially, be disputed.... [The declaration it submitted] amounted to argument, not a demonstration of a *bona fide* dispute.

*Focus Media,* 378 F.3d at 925-26 (quoting the trial court).  Similarly, the facts in this case are "well established and not subject to legitimate dispute."   As in *Focus Media*, Mr. Blixseth presented only bare allegations and conclusory arguments regarding any perceived disputes as to the Petitioning Creditors' claims. He failed to show any evidence of an actual dispute as to those claims.  Consequently, the Bankruptcy Court erred in not properly recognizing and applying the shifting burden of proof required by *Focus Media*. If the Court had applied the correct burden, the undisputed facts demonstrated that no dispute actually existed.  For that reason, this Court should reverse the Bankruptcy Court's Order in that no *bona fide* disputes existed as to the Petitioning Creditors' claims.

## E.   The Bankruptcy Court Ignored Controlling Ninth Circuit Precedent on the Eligibility of Undisputed Claims.

Even if Mr. Blixseth proved he had a genuine but unarticulated, pre-Petition objection to some portion of the Petitioning Creditors' claims, (a point not conceded by MDOR), the Bankruptcy Court erred in failing to recognize that the undisputed portion of the States' claims were sufficient to render them eligible petitioning creditors.  In other words, any alleged disputes by Mr. Blixseth as to small portions of those States' tax claims were irrelevant as a matter of law (notwithstanding the fact that Mr. Blixseth failed to identify any portion to which he had an objective dispute).

In this Circuit, a dispute over the amount of a debt is not considered *bona fide* for purposes of §303(b) unless the debtor's counterclaims or offsets, if netted out, would take the total debt (of all three creditors) below the statutory threshold of $15,325.  *Focus Media, Inc. v. Nat'l Broad. Co. Inc. (In re Focus Media, Inc.)*, 378 F.3d 916, 926 (9th Cir. 2004); *Chicago Title Ins. Co. v. Seko Invs., Inc. (In re Seko Invs., Inc.)*, 156 F.3d 1005, 1007 (9th Cir. 1998). Therefore, if "at least a portion of the debt that is the subject of the petition is undisputed, the

undisputed portion is sufficient to create a debt under [§303(b)] not subject to a *bona fide* dispute." *Focus Media*, 378 F.3d at 926.   Under *Focus Media*, Idaho, California and MDOR were qualifying creditors because the undisputed portions of their claims (whether the amounts on the sworn tax returns or the amounts from conceded Audit Issue #4) far exceeded the §303(b) threshold.

When *Focus Media* was decided, §303(b)(1) required qualifying creditors to hold claims "not…the subject of a bona fide dispute." In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L.No. 109-8,119 Stat. 23 ("BAPCPA"), which, among other things, amended §303(b)(1) to add "as to liability or amount" after the words, "bona fide dispute."   Here, the Bankruptcy Court declined to follow *Focus Media*, instead holding the BAPCPA amendments effectively overruled it, when no Ninth Circuit panel (or any other circuit court) has so held.   The Ninth Circuit has not yet interpreted the BAPCPA amendments to §303(b).   *C&C Jewelry*, 2001 WL 36340326 at *6, *7 ("[W]hether or not BAPCPA changes the Ninth Circuit rule is ultimately not determinative in this case because the Petitioning Creditors have not demonstrated their claims are undisputed *even as to a threshold amount*.")   Consequently, *Focus Media* remains good law in the Ninth Circuit.

In fact, the holding in *Focus Media*, remains good law according to the nationwide trend in interpreting the effects of BAPCPA on §303(b).   This approach is outlined in *In re DemirCo Holdings, Inc*., 2006 Bankr. LEXIS 1131, 2006 WL 1663237 at *3 (Bankr. C.D. Ill. 2006) (unpublished), which explains that courts continue to apply in full the Ninth Circuit's pre-

BAPCPA analysis set forth in *Focus Media* and *Seko*.  While there is case law to the contrary, of the seven cases addressing the issue since 2011, six cases follow *DemirCo*.[15]

In public policy terms, there are compelling reasons to retain the *Focus Media* and *Seko* approach, and no comparable policy justifications for adopting Mr. Blixseth's all-or-nothing rule. In Mr. Blixseth's view, the addition of the new phrase "as to liability or amount" means that any disputed amount, no matter how small—*i.e.,* just $10 on a $100 million claim—renders the entire claim disputed.  As *Collier on Bankruptcy* emphasized:

> Why would Congress want to disqualify a creditor whose claim is noncontingent and at least partially undisputed? Section 303's requirements regarding type and number of claims are an attempt to balance a debtor's interest in staying out of bankruptcy with the interest of creditors in putting a debtor into bankruptcy. Why shouldn't the undisputed, noncontingent portion of a petitioning creditor's claim count? Why disqualify the creditor in toto? Why effectively bar that creditor's access to the bankruptcy forum? Of course, as a practical matter, the prudent creditor will take the suggestion loudly whispered by some courts and simply assert the *un*disputed *non*-contingent portion of its claim.

2 COLLIER ON BANKRUPTCY ¶303.11[2] (16th ed. 2013) (emphasis in the original).

If BAPCPA requires an all-or-nothing analysis, potentially no creditor would ever qualify to file an involuntary petition, because a debtor would simply have to raise some issue disputing the amount of the claim by pennies in order to defeat the entire petition.  *In re Miller*, 489 B.R. 74, 83 (Bankr. E.D. Tenn. 2013).[16]

---

[15] *See In re Wishgard*, __ B.R. __, 2013 WL 1774707 at *5 (Bankr. W.D. Pa. 2013); *In re Roselli*, 2013 WL 828304 at *9 (Bankr. W.D. N.C. 2013) (slip copy); *In re Miller*, 2013 WL 1092116 (Bankr. E.D. Tenn. Jan. 9, 2013) (slip copy); *In re Mountain Country Partners, LLC*, 2012 WL 2394714 (Bankr. S.D. W.V. 2012) (slip copy); *In re EM Equipment, LLC*, __B.R. __, 2013 WL 6859336 (Bankr. D. Conn. 2013);   *In re Fustolo*, __ B.R. __, 2013 WL 6577295 (Bankr. D. Mass. 2013); *but see In re Elverson*, 2013 WL 2138875 (Bankr. E.D. Pa. 2013).

[16] *Miller* is also instructive because the Court found that a creditor with a claim divisible in parts was an eligible creditor, because that creditor could rely upon the undisputed parts to meet the requirements of §303(b).  *Miller*, 489 B.R. at 83-84.  The court stated:

> Because there is no real dispute as to the principal balance owed by the Debtor on loan no. xxx2406 or on the amounts owed on the other loans, all of which are

Here, the Bankruptcy Court incorrectly asserted that BAPCPA's legislative history supported an all-or-nothing approach. Actually, the 2005 amendment only clarified the statute to reflect (i) current law and (ii) the legislative intent in the 1984 amendments to §303(b), that inserted the "*bona fide* dispute" requirement. When viewed historically, BAPCPA's addition of the phrase "and amount" is simply a clarification—as explained in *Miller*, 2013 WL 1092116 at 82-84 (citing *DemirCo* 2006 WL 1663237 at *3). As the *Miller* court recognized, the legislative history does not indicate any Congressional intent that a creditor be ineligible to file an involuntary petition merely because its claim is partially disputed. *Miller*, 489 B.R. at 82. As explained in *DemirCo*, the legislative history from 1984 shows a Congressional intent that the addition of the "*bona fide* dispute" phrase was intended to cover disputes as to both liability *and* amount:

> The problem can be explained simply. Some courts have interpreted section 303's language on a debtor's general failure to pay debts as allowing the filing of involuntary petitions and the granting of involuntary relief even when the debtor's reason for not paying is a legitimate and good-faith dispute over his or her liability. This interpretation allows creditors to use the Bankruptcy Code as a club against debtors who have bona fide questions about their liability, but who would rather pay up than suffer the stigma of involuntary bankruptcy proceedings.

> My amendment would correct this problem. Under my amendment, the original filing of an involuntary petition could not be based on debts that are the subject of a good-faith dispute between the debtor and his or her creditors. In the same vein, the granting of an order of relief could not be premised solely on the failure of a debtor to pay debts that were *legitimately contested as to liability or amount*.

> I believe this amendment, although a simple one, is necessary to protect the rights of debtors and to prevent misuse of the bankruptcy system as a tool of coercion. I

---

> separate transactions and any of which alone could form the basis for Tennessee State Bank;s status as a petitioning creditor, Tennessee State Bank qualifies as a petitioning creditor.

*Id.* Similarly, MDOR, with an undisputed claim for $219,258 based on the uncontested disallowance of an improper deduction (i.e., Audit Issue #4), was and is an eligible petitioning creditor, even if other parts of its claims (i.e., the other audit issues) were disputed.

also believe it corrects a judicial misinterpretation of existing law and congressional intent as to the proper basis for granting involuntary relief.[17]

Consequently, the addition of the words "and amount" in 2005 is compatible with the original 1984 intent.  No legislative history has been found suggesting otherwise.  Senator Baucus' succinct description of the 2005 amendment supports this interpretation:

> This provision amends section 303(b)(1) to specify that a creditor would be ineligible to file an involuntary petition if the creditor's claim was the subject of a bona fide dispute as to liability or amount. It further provides that the claims needed to meet the monetary threshold must be undisputed.

H.R. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 149 (2005).  The second sentence clarifies what kind of dispute as to amount is at issue in §303(b)—i.e., the claims needed to reach the monetary amount.  Once the threshold is crossed, any disputes regarding amounts above that threshold are irrelevant.

With a dearth of committee comments and legislative history to interpret BAPCPA, the Bankruptcy Court erred in holding Congress added the phrase "as to liability and amount" to overrule Ninth Circuit law and thereby require the claims of involuntary petitioners to be fully liquidated, either by agreement or judgment, with no dispute as to even a small portion of such claims.  As the *Miller*, *DemirCo* and *Tucker* courts concluded, courts should not presume such a substantive change in the law as a result of BAPCPA.  *See, e.g., DemirCo*, 2006 WL 1663237, at *3, 2006 Bankr. LEXIS 1131, at *9; *see also In re Tucker*, 2010 WL 4823917, at *6, 2010 Bankr. LEXIS 3971, at *18 (Bankr. N.D. W.Va. Nov. 22, 2010) ("The better reasoned authority suggests that a petitioning creditor is not disqualified even if a bona fide dispute exists regarding a *portion* of its claim.")  To the extent a petitioning creditor has an undisputed portion of its

---

[17] 130 Cong. Rec. S7618 (daily ed. June 19, 1984) (remarks of Sen. Baucus) (emphasis added) (also quoted in *Matter of Busick*, 831 F.2d 745 (7th Cir. 1987)).

claim and the aggregate claims (of all the creditors) exceed the $15,325 threshold, that creditor is eligible.

Here, the Bankruptcy Court's error of law as to BAPCPA played a crucial role in its wrongful decision to grant summary judgment. Idaho illustrates why. As noted above, the only "evidence" cited by the Bankruptcy Court that Mr. Blixseth had a *bona fide*, pre-Petition dispute with Idaho's claim is that Idaho settled its claim, post-Petition, at a $200,000 discount. (MER 1:1:00014.) However, in that settlement, Mr. Blixseth paid Idaho the sum of $925,000. (MER 5:47:01030.) Even if that settlement discount were evidence of a legitimate pre-Petition dispute (which it was not), the <u>undisputed</u> portion of Idaho's claim—i.e., $925,000—was still 60 times greater than the $15,325 threshold set forth in the Bankruptcy Code. Under the Ninth Circuit's *Focus Media* and *Seko* cases, all three original Petitioning Creditors are eligible creditors under the Code. The Bankruptcy Court erred in concluding otherwise.

**F.    The Bankruptcy Court Erred In Concluding As A Matter Of Law That Mr. Blixseth Had Met His Burden of Showing He Had 12 or More Creditors as of the Petition Date.**

**1.   Mr. Blixseth Bore the Initial Burden of Showing He Had 12 or More Eligible Creditors as of the Petition Date.**

An involuntary bankruptcy can be filed by three or more petitioning creditors with qualifying claims. 11 U.S.C. §303(b)(1). However, if a debtor has fewer than 12 qualifying creditors, an involuntary bankruptcy can be filed by just one eligible petitioning creditor (though more are permissible). *Id.* At the hearing, the Petitioning Creditors asserted that Mr. Blixseth failed to meet his initial burden of proving the existence of 12 or more qualifying creditors, squarely putting this threshold question to the Bankruptcy Court. (MER 1:1:00005.)

Mr. Blixseth incorrectly contended, and the Bankruptcy Court wrongfully held, that the burden of proof was on MDOR to prove he had fewer than 12 creditors. (MER 1:10:00139.)

However, in the Ninth Circuit, the initial burden of proof belonged to Mr. Blixseth.  The Bankruptcy Rules and relevant case law indicate that an involuntary debtor must prove up the existence of 12 or more creditors.  In support of this burden, the Bankruptcy Rules require the involuntary debtor to aver to the existence of 12 or more creditors:

> If the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses, a brief statement of the nature of their claims, and the amounts thereof.

Bankruptcy Rule 1003(b).[18]  In a case squarely on point (i.e., three creditors signed a petition, the debtor challenged eligibility, and the number of creditors was at issue), a bankruptcy court stated that "the initial burden of proving that the requisite number of creditors filed the petition is upon the Debtor who must satisfy its burden by a preponderance of the evidence standard."  *In re Global Waste*, 207 B.R. 542, 544 (Bankr. N.D.Oh. 1997).  The debtor must file "a list of creditors under Rule 1003(b) in support of its motion to dismiss the involuntary petition for lack of creditor support."  *Id.*

Moreover, that list must be accompanied at trial by legitimate supporting evidence, or else the debtor's burden is not met.  As the Ninth Circuit stated in *In re Rothery*, 143 F.3d 546, 548-50 (9th Cir. 1998):

> The Bankruptcy Court defined the deficiency and invited Rothery [the involuntary debtor] to support her bare allegation of more than twelve creditors. She declined, arguing that the burden was on Cunningham [the petitioning creditor]. She was mistaken and [that] mistake is fatal to her argument on appeal. It was not error to grant summary judgment *sua sponte.* The party opposing summary judgment may not do so based on "mere allegations". *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510 (1988).*

---

[18] The Bankruptcy Court refused to require Mr. Blixseth to file a list of creditors under Rule 1003(b), holding that Mr. Blixseth's motion to dismiss did not amount to an answer, notwithstanding FED. R. CIV. P. 12 and Bankruptcy Rule 7012.  (MER 1:1:00005.)

*See also In re McIsaac*, 19 B.R. 391, 393-94, 397 (Bankr. D.Mass. 1982) (debtors ordered to produce documentary evidence that would verify the existence of creditors; debtors only gave vague and general descriptions of their creditors; court denied the 12-creditor defense).    Only after the involuntary debtor meets his initial burden would the burden shift to the petitioning creditors to show "that the Debtor has fewer than twelve (12) *bona fide* creditors."   *Global Waste*, 207 B.R. at 544.

Numerous other courts follow this approach.  *See, e.g., In re Smith*, 415 B.R. 222 (Bankr. N.D.Tx. 2009); *In re Moss*, 249 B.R. 411 (Bankr. N.D.Tx. 2000); *In re Colon*, 474 B.R. 330, 363-64 (Bankr. D.P.R. 2012); *In re Green*, 2007 WL 1093791 at *6 (Bankr. W.D.Tx. 2007) (unpublished); *In re McIsaac*, 19 B.R. 391, 393-94 (Bankr. D.Mass. 1982).  As one court noted:

> The burden of raising the issue of the number of creditors, and thus, the requisite number of creditors to file a petition rests with the alleged debtor….That the debtor has the burden of raising the issue of the number of creditors stands to the test of reason, since the alleged debtor is the only party with such knowledge and without intimate knowledge of the alleged debtor's affairs the petitioner would have no way of knowing.

*In re Coppertone Communications, Inc.*, 96 B.R. 233, 235-36 (Bankr. W.D.Mo. 1989).

Mr. Blixseth failed to identify any case law to the contrary at the hearing.  In his reply brief below, he cited two cases that support MDOR's position:  *Rothery* and *Colon*.  (MER 1:10:00139.)  *Rothery* is discussed above.  In *Colon*, the court distinguished *Rothery*, but not because the burden of proof rests on the petitioning creditor.  Instead, *Colon* held that the debtor has the burden, but the debtor met her burden there by "submit[ting] documentary evidence to support his position."  *Colon*, 474 B.R. at 364.

Despite Ninth Circuit and other authority to the contrary, the Bankruptcy Court concluded that the burden rested upon the Petitioning Creditors on all issues, including whether Mr. Blixseth had the requisite number of 12 or more creditors.  (MER 1:1:00006.)  Based on the

above authorities, the Bankruptcy Court erred in so concluding.  As detailed below, this error led to an improper legal analysis of the undisputed facts regarding Mr. Blixseth's creditors.

### 2. The Bankruptcy Court Erred In Concluding That Mr. Blixseth Met His Burden To Show He Had 12 or More Eligible Creditors as of the Petition Date.

The only evidence presented as to the existence of Mr. Blixseth's creditors came from Mr. Blixseth.  As the Bankruptcy Court held, there was no dispute as to the facts presented at the hearing.  (MER 1:1:00004.)  Numerous problems existed with the evidence Mr. Blixseth put into the record regarding his creditors.  Mr. Blixseth:  (i) refused to produce a Rule 1003(b) list of creditors; (ii) made substantively inconsistent statements about his creditors; (iii) stated, in releasing the names of certain alleged creditors during discovery, that not necessarily all of them met the definition of a "creditor" under Bankruptcy Code §303(b); (iv) provided documentation showing <u>no</u> claim was owed as of the Petition Date for 11 of his 18 creditors; (v) for another 5 creditors, refused to provide any evidence whatsoever, based on a claim of privilege; and (vi) demonstrated that a majority of his listed creditors held disqualifying avoidable transfers. Notwithstanding these issues, the undisputed record demonstrated that a sufficient number of the creditors that Mr. Blixseth chose[19] to disclose were <u>not</u> qualified to count toward his 12 creditors.  Taking out the unqualified creditors, Mr. Blixseth failed to demonstrate he had 12 or more creditors on the Petition Date of April 5, 2011.

---

[19] The Appellant uses the word "chose" because, when Mr. Blixseth finally produced a list of alleged creditors, he expressly refused to state that the listed creditors met the definition of a "creditor" for §303(b) purposes.  He said:

> Mr. Blixseth will answer Interrogatory No. 1 by identifying a sufficient number of his creditors under 11 U.S.C. §303(b) that he believes to be undisputed but not necessarily undisputed as to amount as of the petition date….Mr. Blixseth's identification of the requested claimants is without regard (and therefore without prejudice) to whether the claimant's claim has matured, was past due or in default as of the petition date.

(MER 7:63:01397 (at 23-25).)

44

**A.  Creditors With No Claims As of the Petition Date.**

The first fundamental requirement of an eligible creditor in an involuntary bankruptcy is that the creditor must actually be owed a debt on the petition date.  If the alleged creditor is not owed a debt as of the petition date, it has no claim against the involuntary debtor and cannot be a creditor under the Code.  See 11 U.S.C. §§101(5), (10), and (12) (definitions of "claim", "creditor", and "debt").  Evidence at the hearing showed that six of Mr. Blixseth's alleged creditors had no claim as of the Petition Date.  The evidence showed Mr. Blixseth had already paid, prior to the Petition Date at least six creditors—Neiman Marcus, City of Medina, Puget Sound Energy, Comcast, Medina Gardening and Landscape, Inc., and US Bank.  *See* Section III(C)(4) *supra*.  Further, Mr. Blixseth's documentation strongly suggested he had already paid five other creditors—Big Horn Golf Club, Qwest, Lewis Cellars, TransAmerica and ADT.  *See* Section III(C)(4) *supra*.  No other evidence exists in the record to show that those creditors were owed a debt as of the Petition Date.

The Bankruptcy Court even stated, "[i]ndeed, in some cases – Neiman Marcus, and most of the utilities – it is likely that the bills were paid before the Petition Date."  (MER 1:1:00006.)  The Order nonetheless concluded that "it begs common sense to believe that these entities did not provide services after payment, thus possessing accrued but unbilled balances on the Petition Date." *Id*.  The Bankruptcy Court then concluded "there is no evidence that such a relationship terminated after the petition date for nonpayment, there is a debt for purposes of Section 303(b)(2)." *Id*., p. 7.  Yet, the Bankruptcy Court ignored the lack of any evidence that a debt for each of these creditors was actually owing on the Petition Date.

In so holding, the Bankruptcy Court erred by first concluding that the burden to show the existence of a debt was the Appellant's burden.  *See Rothery*, 143 F.3d at 550.  Second, the

Bankruptcy Court erred by not correctly viewing the undisputed evidence under the required summary judgment standard.  In that summary judgment context, the court must "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the [bankruptcy] court correctly applied the relevant substantive law." *Grimmett v. Brown,* 75 F.3d 506, 510 (9th Cir. 1996).  The only evidence in the record indicated that no debts were owed to the creditors listed above.  There was no other evidence of a claim.  Instead, the Bankruptcy Court relied upon its own speculation that debts should exist.  Given the evidence and the required standard, the Bankruptcy Court erred in holding that these creditors held requisite claims as of the Petition Date.

### B.  Creditors Receiving Disqualifying Avoidable Transfers.

In determining the number of creditors an alleged debtor has on the Petition Date, certain types of creditors are excluded.  Recipients or transferees of a voidable transfer under certain provisions of the Bankruptcy Code are excluded.  Those provisions are Bankruptcy Code §§544, 545, 547, 548, 549 and 724(a).  11 U.S.C. §303(b)(2).  In Mr. Blixseth's hearing, the undisputed evidence demonstrated that a significant number of his alleged creditors were recipients of transfers that could be avoided under §§547, 548 and 549.

Bankruptcy Code §547 deals with prepetition preferential transfers.  Transfers (or payments) made by a debtor on account of an antecedent debt within 90 days prior to a bankruptcy filing are avoidable under §547 as preferential transfers.  11 U.S.C. §547(b).  Bankruptcy Code §548 deals with prepetition fraudulent transfers.  Transfers made by a debtor within two years prior to a bankruptcy filing in which the debtor received less than reasonably equivalent value (or no value) in exchange for such transfer are avoidable under §548 as fraudulent transfers.  Section 549 deals with unauthorized postpetition transfers by a debtor.  If a

debtor makes a transfer of bankruptcy estate property after the filing of the bankruptcy without bankruptcy court authority, such transfer is avoidable under §549, particularly when the transfer is the payment of a pre-bankruptcy obligation of the debtor.

The undisputed evidence at the hearing (all of which originated from Mr. Blixseth) demonstrated that a majority of Mr. Blixseth's 18 alleged creditors received disqualifying voidable transfers from Mr. Blixseth.  Creditors holding such transfers may not be counted in determining the number of creditors that a debtor has as of the Petition Date, particularly when the payments were made on prepetition debts.  *See In re Int'l Teldata Corp.*, 12 B.R. 879, 882 (Bankr. D. Nev. 1981) (finding certain post-petition transfers were for pre-petition debts and stating, "those creditors who were repaid by the Alleged Debtor in this fashion cannot be counted in determining the number of petitioning creditors which are necessary under 11 U.S.C. §303(b).").

Section 549(b) of the Bankruptcy Code shelters some postpetition transfers from avoidance if they are made during a gap period between the filing of the involuntary bankruptcy and the order for relief and if such transfers were given in exchange for post-petition value, including services to the debtor.   11 U.S.C. §549(b).   However, §549(b) does not shelter postpetition "gap" transfers that satisfy or securitize prepetition debt.  *Id.*   Other types of gap period payments are avoidable.  In sum, transfers in this "gap" period are avoidable if made in satisfaction of prepetition obligations.

Based on the foregoing authority and the undisputed evidence at the hearing, these purported creditors listed by Mr. Blixseth are not qualifying creditors under §303(b)(2) because each received avoidable transfers:

- **City of Medina**: Mr. Blixseth testified the debt related to remodeling work on property owned by a third party, Kawish LLC.  (MER 8:70:01560 (line 14) – 01561 (line 17).)

The invoice was sent to "Blixseth/Kawish LLC" (MER 7:64:01423), but Mr. Blixseth was merely a point person on Kawish's behalf.  There is no evidence of a claim owed by Mr. Blixseth to City of Medina, so any payment is voidable under Bankruptcy Code §548 as a fraudulent transfer since the payment by Mr. Blixseth was used to pay the debt of another entity, Kawish LLC.

- **ADT**:  The one invoice produced for ADT is dated March 21, 2011 for quarterly services.  (MER 7:64:01424.)  Mr. Blixseth testified that those security services were for offices in Rancho Mirage, California, owned by Desert Ranch LLLP.  (MER 8:70:01562 (at 3-12); 01563 (at 18-20).)  Consequently, no value was received by Mr. Blixseth for this payment and it is voidable under §548 as a fraudulent transfer since the payment by Mr. Blixseth was used to pay the debt of another entity, Desert Ranch LLLP.

- **Chubb**:  The evidence (MER 7:64:01430-01438) and testimony confirmed that the insurance policies were for yachts, vehicles, and real property owned not by Mr. Blixseth, but by his wife, Desert Ranch LLLP, and Kawish LLC.  (MER 8:70:01577 (at 14); 01579 (at 8-12); 01580 (at 1-7).)  There is no evidence of a claim owed by Mr. Blixseth to that insurer, so any payment is voidable under §548 as a fraudulent transfer, since the payment by Mr. Blixseth was used to pay the debts of other entities.

- **US Bank**:  Mr. Blixseth testified that his ordinary course of dealing was to prepay the account or pay on time so no interest would accrue.  MER 8:70:01539 (line 6) – 01545 (line 23).)  However, as the invoices at the hearing demonstrated (MER 7:64:01418), Mr. Blixseth incurred interest charges in the pre-bankruptcy portion of 2011.  (MER 8:70:01539 (line 6) – 01545 (line 23).)  Given the dates of the invoices, the partial or late payment that caused the accrual of interest had to have occurred within the 90 days prior to the Petition Date.  *Id.*  Consequently, US Bank was the recipient of a preferential payment voidable under §547, since he paid off an antecedent debt within the 90 days.  Additionally, Mr. Blixseth testified the invoice spanning the Petition Date was paid, so, because that invoice was for prepetition goods and services, the payment is voidable under §549 as an unauthorized postpetition payment of a prepetition claim.

- **Qwest**:  The invoice Mr. Blixseth produced is dated March 19, 2011 and shows a balance due of $398.88, a balance forward of $196.25, and a late payment charge of $2.38.  To the extent payment was made before the Petition Date, Qwest is not a qualifying creditor because no debt was owed.  To the extent that a payment was made on the past due amount, the payment is voidable under §547 as a prepetition preferential payment.  To the extent Qwest had outstanding charges on the Petition Date that were paid after the Petition Date, such payment is voidable under §549 as an unauthorized postpetition transfer.  Under any scenario, Qwest cannot count toward the requisite 12 creditors.

- **Big Horn Golf Club**:  The invoice dated February 28, 2011 shows a balance due of $504.15.  To the extent a payment was made after the Petition Date, that payment is voidable under §549 as an unauthorized postpetition transfer.

- **Prudential Life Insurance**:  The March 25, 2011 invoice shows a balance due as a life insurance premium payment for the period April 20 to July 19, 2011.   (MER 7:64:01428.)  To the extent the invoice was paid after the Petition Date, that payment would be voidable under §549 as an unauthorized postpetition transfer.

- **TransAmerica Life Insurance**:  The due date for the premium is March 24, 2011. (MER 7:64:01429.)  To the extent a payment was made after that date, the payment is voidable under §547 as a prepetition preferential payment.  To the extent TransAmerica had outstanding charges paid after the Petition Date, such payment is voidable under Bankruptcy Code §549 as an unauthorized postpetition transfer.

- **Lewis Cellars**:  The invoice due date was March 24, 2011.  (MER 7:64:01427)  To the extent a payment was made after that date but before the Petition Date, it is voidable under §547 as prepetition preferential payment.   To the extent it was paid after the Petition Date, it is voidable under §549 as an unauthorized postpetition transfer.

- **Mack, Roberts & Co.; Mike Flynn, Stillman & Associates; Rosen Law; Hagen & O'Connell**:  Mr. Blixseth testified that most of the amounts paid to these firms were for prepetition services.   (MER 8:70:01587 (at 15-19).)   Mr. Blixseth testified that the amounts due and owing as of the Petition Date were later paid post-petition (MER 8:70:01651 (line 20) – 01652 (line 3),) thereby making all five professional entities recipients of avoidable transfers under §549.

In short, for the purposes of 11 U.S.C. §303(b), Mr. Blixseth failed to meet his burden of showing that he had 12 or more eligible creditors as of the Petition Date.  By incorrectly applying the legal standards on the parties at the hearing, the Bankruptcy Court erred in concluding that the above creditors were in fact eligible creditors under §303(b).   If the Bankruptcy Court had applied the correct legal standards to the burdens placed upon the parties and the review of the undisputed facts, most of Mr. Blixseth's alleged creditors would have been disqualified under §303(b).  As a result of this disqualification, Mr. Blixseth would have failed to prove up the requisite number of creditors under Bankruptcy Code §303(b), thereby requiring the denial of Mr. Blixseth's motion to dismiss in light of the Bankruptcy Court's conclusion that one of the petitioning creditors (YCLT) was an eligible petitioning creditor.  Given that YCLT was found by the Bankruptcy Court to be a qualifying petitioning creditor, the Bankruptcy Court erred in granting the Motion to Dismiss.

**V.**
**CONCLUSION**

For the reasons set forth above, MDOR respectfully submits that the lower court's dismissal order should be reversed and the case remanded to the Bankruptcy Court for further proceedings under Bankruptcy Code §303.  The Bankruptcy Court erred in concluding that the claims of the three original Petitioning Creditors—California, Idaho, and the MDOR—were subject to *bona fide* disputes as of the Petition Date.  The Bankruptcy Court also erred in misapplying the shifting burden of proof on that issue; in misinterpreting the effect of the 2005 BAPCPA amendments; in misapplying the burden of proof on the number-of-creditors issue, and in determining that Mr. Blixseth had the requisite number of creditors as of the Petition Date.

Dated:  August 21, 2014          Respectfully Submitted:

| | | |
|---|---|---|
| */s/ Rodney Jean* | */s/ Lynn Hamilton Butler* | */s/ Keith A. Jones* |
| Rodney M. Jean | Lynn Hamilton Butler | Keith A. Jones |
| Lionel Sawyer & Collins | Husch Blackwell LLP | MDOR Legal Services Office |
| 300 S. 4th St., Suite #1700 | 111 Congress Ave., # #1400 | 125 North Roberts Street / P.O. |
| Las Vegas, NV 89101 | Austin, TX 78701 | Box 7701 |
| rjean@lionelsawyer.com | lynn.butler@huschblackwell.com | Helena, MT  59604-7701 |
| (702) 383-8830 | (512) 472-5456 | kjones@mt.gov |
| (702) 383-8845 (fax) | (512) 226-7318 (fax) | (406) 444-5884 |
| | | (406) 444-3696 (fax) |

*Attorneys for Montana Department of Revenue*

**CERTIFICATE OF SERVICE**

This will certify that on the 21st day of August, 2014, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF notification system to parties subscribing to such system, and via electronic mail on the parties listed below.

Tim L. Blixseth
1605 73rd Ave., NE
Medina, WA 98039-02330
Email:  timblixseth@aol.com

                                        */s/ Lynn Hamilton Butler*
                                        Lynn Hamilton Butler